**Joyce BICKERSTAFF, Plaintiff,**

v.

**VASSAR COLLEGE, Defendant.**

**No. 96 Civ. 9054 CLB.**

United States District Court,
S.D. New York.

Jan. 26, 1998.

Eleanor Jackson Piel, New York City, for Plaintiff.

John M. Donoghue, Donoghue, Thomas, Auslander & Drohan, Mt. Kisco, NY, for Defendant.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

Before this Court for decision in this civil rights action by a faculty member against Vassar College, is a motion for summary judgment pursuant to Rule 56 Fed.R.Civ.P., heard and fully submitted for decision on December 19, 1997. This court withheld decision awaiting resolution of a Petition for Certiorari filed in *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (en banc), hereinafter *Fisher II.* Certiorari was denied on January 20, 1998. *See* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752. Essentially, with minor variations, this case is a reprise of *Fisher II.*

Plaintiff, Dr. Joyce Bickerstaff, an African–American woman, is a tenured associate professor at Vassar College with a joint appointment in the Department of Education and the Africana Studies Program. She has been a member of the Vassar faculty for 25

years. Dr. Bickerstaff twice applied for promotion to full professor, once in 1989 and again in 1994, and was denied each time. After the second denial she filed a complaint with the EEOC, and was issued a right to sue letter. She commenced this action on November 29, 1996. Dr. Bickerstaff contends that Vassar has discriminated against her because of her race and gender, and is seeking money damages under Title VII, 42 U.S.C. § 1981 and the Equal Pay Act.

Dr. Bickerstaff graduated from Kent State University in Kent, Ohio, where she obtained an undergraduate degree in education specializing in the field of early childhood education and child development. She obtained a Masters Degree in Education at the University of Illinois at Champagne–Urbana in 1968, and received a Doctorate at the same University in Social Sciences in 1975. Immediately upon graduating from college, she taught in the public schools of Cleveland, Ohio, and taught at Vassar College during the summers. In the summer of 1968 she took a course at San Francisco State College, and in 1971 she attended a summer workshop course at the University of North Carolina at Greensboro. Vassar College hired Dr. Bickerstaff in 1971 as a lecturer in the Africana Studies Program and as a director of the program in elementary education within the Education Department.

It was understood originally that her joint appointment was allocated two-thirds to the Department of Education and one-third to Africana Studies. Later that allocation was reversed. In 1978 Ms. Bickerstaff was promoted to the rank of Associate Professor and was granted tenure.

In declining to review *Fisher II* our Supreme Court let stand the much criticized yoyo rule about the shifting burden of persuasion in employment discrimination cases, referred to more euphemistically by plaintiff's attorney as "the minuet."[1] First, plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case the plaintiff must show (1) that she belongs to a protected class (2) that she was qualified for the position (3) that she was denied the position and (4) that

the position was ultimately filled by a person not of the protected class. *Fisher II,* 114 F.3d at 1335; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). However, in *Stern v. Trustees of Columbia University,* 131 F.3d 305 (2d Cir. 1997) decided after *Fisher II,* the elements of a prima facie Title VII case of discrimination were listed as (1) membership in a protected class, (2) qualification for the position, (3) denial of the position and (4) the fact that the denial occurred in circumstances giving rise to an inference of discrimination on the basis of the plaintiffs membership in the protected class (citing *Burdine,* 450 U.S. at 253, n. 6, 101 S.Ct. at 1094; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29 at 37; *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991)). *See also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996).

A majority of the panel in *Stern* distinguished the *en banc* holding in *Fisher II.* We assume *Fisher II* still represents the law in this Circuit.

Once the plaintiff has established a prima facie case the burden shifts to the employer to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094); *Fisher II,* 114 F.3d at 1335. if the defendant satisfies this burden, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and the plaintiff has the ultimate burden of proving that the defendant's reason was merely a pretext for discrimination. *Fisher II,* 114 F.3d at 1335 (quoting *St. Mary's,* 509 U.S. at 510, 113 S.Ct. at 2749).

In declining to review *Fisher II* our Supreme Court also let stand a new rule in this Circuit, in which the term "prima facie case," for purposes of employment discrimination cases only, has been given a new meaning of some sort. This new meaning seems incon-

---

**1.** *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

sistent with the idea that the proponent has presented sufficient evidence which, if believed, allows the trier of fact to find discrimination as an ultimate fact. *See Fisher II,* 114 F.3d at 1386 (Winter, J. dissenting). This Cheshire Cat type prima facie case can only bring confusion to our craft.[2]

█ This case involves promotion, rather than tenure, as in *Fisher II,* but like tenure decisions, faculty promotion decisions present unique employment issues, in that they are usually not directly competitive, they involve decentralized decision making and the consideration of numerous different factors, and they often result in disagreement because of the high stakes and the great number of variables. *Zahorik v. Cornell University,* 729 F.2d 85, 92–93 (2d Cir.1984); *see also Fisher v. Vassar College ("Fisher I"),* 70 F.3d 1420, 1434–35 (2d Cir.1995).

Our Court of Appeals has held that absent evidence showing that the decision was influenced directly by considerations such as sex or race "universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities." *Zahorik,* 729 F.2d at 94. "The Congress that brought educational institutions within the purview of Title VII could not have contemplated that the courts would sit as 'Super–Tenure Review Committee(s).'" *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980) (citing *Keddie v. Pennsylvania,* 412 F.Supp. 1264, 1270 (M.D.Pa.1976)).

In the case at bar we assume Dr. Bickerstaff has met the minimal requirements of presenting a Cheshire Cat prima facie case of discrimination. She is a member of two protected classes, and she was denied the promotion for which she applied. Nothing about the denial itself raises inferences of discrimination, except that she has served so long, and sought promotion twice, unsuccessfully.

The burden then shifts to Vassar to show that the decision was not a result of discrimination. Vassar states that Dr. Bickerstaff was not promoted to full professor because she:

> demonstrated neither marked distinction in scholarship nor teaching and, therefore, did not meet the College's stated qualifications for promotion to full professor.

Defendant's Answer, ¶ 23. The burden now shifts back to Dr. Bickerstaff, who must show that this proffered reason is false and a pretext for discrimination, in order to sustain her Title VII action. *Fisher II,* 114 F.3d at 1339 ("We have recognized again and again that a plaintiff does not necessarily satisfy the ultimate burden of showing intentional discrimination by showing pretext alone. A finding of pretext may advance the plaintiff's case, but a plaintiff cannot prevail without establishing intentional discrimination by a preponderance of the evidence."). The district court "must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination ... if not, the defendant is entitled to summary judgment ..." *Fisher II,* 114 F.3d at 1347; *Stern,* 131 F.3d 305, 312.

Because this is a motion for summary judgment the record must be read in the light most favorable to the plaintiff and all permissible inferences must be drawn in her favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The inferences drawn must be supported by the record, however, and the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Williams v. Smith,* 781 F.2d 319, 323 (1986)

---

**2.** *See* Lewis Carroll, *Alice in Wonderland* (1865), Ch. 6, "The Cheshire Cat kept appearing and vanishing so suddenly that Alice complained '... I wish you wouldn't keep appearing and vanishing so suddenly: you make one quite giddy.' 'All right,' said the cat; and this time it vanished quite slowly beginning with the end of the tail, and ending with the grin, which remained some time after the rest of it had gone. 'Well! I've often seen a cat without a grin,' thought Alice; 'but a grin without a cat! It's the most curious thing I ever saw in my life!'" The vanishing prima facie case envisioned by the majority in *Fisher II* may not be the most curious thing we have ever seen, but it comes close.

("Mere conclusory allegations or denials will not suffice.").

This Court concludes that the evidence of discrimination on the part of Vassar College that has been proffered by Dr. Bickerstaff is not sufficient to survive this motion for summary judgment. The evidence presented by Dr. Bickerstaff consists of: her own testimony as to her perception of a discriminatory atmosphere in the Education Department and perceived personal hostility toward her by Professor Robin Trainor, chair of the Education Department, the testimony of Lawrence Mamiya, a full professor in Religion and Africana Studies, stating that in his opinion Dr. Bickerstaff was not promoted because of her race; the testimony of Daniel Perlstein, an Assistant Professor in the Department of Education, stating that Professor Trainor had a low opinion of Dr. Bickerstaff, that Trainor did not respond adequately to the complaints of two African–American students in the Spring of 1996 who felt that they were being discriminated against, that there is a high rate of failure of African–American students in the Education program, and that Shamba Donovan, one of the authors of the negative Student Advisory Committee (SAC) report mentioned below, was overtly racist.

As noted earlier, Plaintiff was denied promotion to full professor in 1989. No litigation ensued. In 1994 she made the application which is the subject of this case. Between 1989 and 1994 she published no scholarly articles. She spent the entire 1990–91 and 1991–92 academic years on leave, while serving as a visiting professor at Berea College in Kentucky. Essentially there was no significant change in her career or in her vitae between 1989 and 1994.

Vassar has posted guidelines or standards for appointment and promotion of faculty. The relevant provisions, published in the *Vassar Faculty Handbook,* are as follows:

*Regular full-time Appointments*

\* \* \*

A. Professor: Continued demonstration of significant scholarship of artistic activity [sic], and teaching of a high quality are necessary for appointment at this level. Members of the faculty of this rank shall have achieved marked distinction in at least one of these categories, preferably both.

\* \* \*

4. *Promotion to full professor:* The review will consider all professional accomplishments since the granting of tenure. Continued demonstration of sound scholarship or significant artistic activity and teaching of high quality will be required. It is necessary that marked distinction will have been reached in scholarship or teaching, preferably in both.

An additional important consideration will be academic leadership, which may be evidenced by participation in professional activities outside the College, service on committees within the College, or contributions to educational innovation or policy making at both the departmental and college levels.

\* \* \*

II PROCEDURES FOR REVIEW OF FACULTY MEMBERS FOR REAPPOINTMENT AND PROMOTION

\* \* \*

A. *Departments*

1. The department chair should ask department members under review to submit material pertinent to the department's consideration. Materials assembled by the chair should include up-to-date *vitae,* all annual activities reports, student evaluations, and all relevant evidence of scholarship or artistic activity.

Meaning no disrespect to a distinguished college, most of the criteria to be reviewed is just so much bafflegab. Like beauty, stated criteria like "marked distinction" lie in the eyes of the beholder. An exception to this extreme subjectivity is the requirement of "teaching of a high quality." As to this criterion, Vassar relies on the results of Course Evaluation Questionnaires ("CEQs") submitted anonymously by students. Plaintiffs CEQs were poor and getting poorer. The Student Affairs Committee (SAC) ad-

ministers the CEQs and in the case of Dr. Bickerstaff reported to the Review committee as follows:

... SAC searched for trends in Ms. Bickerstaff s CEQ's such as course load, class size, and class level. The only identified trend is a steady decline in evaluations. Specifically, in the concluding questions she received 0% three or lower on both question eight "about the overall effectiveness of the course," and on question nine, about "the overall effectiveness of this instructor," on her oldest report ... whereas 76% and 72% on question eight and 71% and 81% on question nine marked three or below · in her most recent reports ... (P)erhaps more telling is her decline in ratings in the **same** classes over time.

The SAC concluded:

**SAC strongly recommends, by a vote of five to zero (with one abstention) that Ms. Bickerstaff not be promoted to full professor at this time.** In fact, SAC is so concerned at Ms. Bickerstaff s performance that it feels her present status as an associate professor deserves re-examination by the College. (Boldface in original)

Recognizing that in a summary judgment case our Court of Appeals reviews the entire record *de novo* we spare our readers from an overly detailed recital of all the hearings, meetings and other academic procedures accorded Plaintiff on her application for promotion. By a divided vote after lengthy study and deliberation of a large number of Dr. Bickerstaff s academic peers, acting on several levels and with the aid of outside consultation, she was denied promotion to full professor.

As noted above, the Student Affairs Committee ("SAC") reviewed and analyzed the CEQs and issued a 5–0 (with one abstention) recommendation against promotion for Dr. Bickerstaff. After a meeting between the Education Program and the Africana Studies Department, the Education and Africana Studies ad hoc committees both issued theirs recommendations in early December. The Africana Studies committee gave a positive recommendation, but did note the Plaintiff's low CEQs and the pattern of decline in the CEQs in recent years. The committee wrote

"We urge that Bickerstaff refocus and reinvigorate her efforts in the classroom." Ex. O, p. 132–33. The Education ad hoc committee recommended against promotion for the Plaintiff. It voted that her scholarship was "creditable" but did not yet exhibit "marked distinction," and that her teaching also fell short of marked distinction "... by a rather wide margin." Ex. I, p. 3.

On December 7, 1994, the Faculty Appointments Salary Committee ("FASC"), comprised of faculty representatives elected by their peers, unanimously found that Dr. Bickerstaff did not meet the criteria for promotion. The Committee noted Dr. Bickerstaffs low CEQs in its finding. Ex. J, p. 1.

On January 23, 1995, the President of the College met with the ad hoc committee on Africana Studies, the Activity Dean and the FASC. On February 8, 1995, the College President wrote to Dr. Bickerstaff and informed her that she would not be recommended for promotion to the Board of Trustees that year. Dr. Bickerstaff filed an intramural appeal which was denied by the Appeal Committee on May 29, 1996.

While most of the published criteria are so vague and value loaded as to defy review by a trial jury, at least the CEQs would seem to be so adverse and yet objective, as to prevent any finding of pretext. Dr. Bickerstaff seeks to meet the problem of adverse CEQs by noting that her ratings were better in her Africana classes than in her work for the Education Department and argues that student racial bias may have distorted the result. However, the race of the students reporting is not recorded by Vassar. She also points out that such ratings are not given great weight in other institutions.

There is insufficient evidence to permit this court or a trial jury to ignore the bad CEQs. At least they were an actual objective record and Vassar had the right to rely on them even if other institutions now tend to discount such evidence. As Judge Calabresi noted in his concurring opinion in *Fisher II,* the court should not attempt to set standards for the employer. Doing so, he wrote, "is always pernicious. It is particularly pernicious in the academic context, where, second

only to athletics, we all think that we are better coaches than the coaches themselves." *Fisher II*, 114 F.3d at 1361 n. 13 (Calabresi, J., concurring in part and dissenting in part).[3] On the totality of the evidence no reasonable juror could find that the stated grounds for the decision were pretextual. In addition, Plaintiff was not competing head to head against another applicant for full professorship either in the Education Department or the Africana Studies Program. That another person not in the protected group was promoted instead of the Plaintiff is ordinarily an essential element of a Title VII claim. It is not present here. For that reason, and also because Plaintiff has not demonstrated that Vassar's stated reasons for not promoting her, that she did not fulfill the stated qualifications, especially with respect to teaching excellence were pretextual, Plaintiff cannot prevail. In light of *Fisher II*, Plaintiffs prima facie case has vanished like the Cheshire Cat, and Vassar College is entitled to summary judgment in its favor.

We confess to a slight unease in reaching this conclusion. Traditionally, issues such as whether Plaintiff's scholarship was of "marked distinction" or only slightly distinct, would present fact questions for a jury. Legal realists if any of them survive in the courts of this Circuit, might well conclude in light of *Fisher I* and *Fisher II* and the cases cited therein, that our present case law seeks to prevent mere jurors, or trial judges for that matter, from thrashing around in the sacred groves of academe looking for possible racial or gender bias, in faculty determinations made usually by a large committee on an extensive record. This may represent a practical distinction.[4] The federal employment discrimination statutes were designed to protect the millhands, with little thought to the universities which Congress need not have included, but it did. Today almost every employee is a member of a protected statutory class based on age, race, gender, national origin, handicap or perception of handicap or something else, and those few who are not can assert the judge-made protection against reverse discrimination. Ju-

ries now adjudicate the petty unfairness on the job which used to be resolved on the floor of the factory by a shouting match between the shop steward and the foreman. There may be no principled basis available to support a distinction for academic employers such as Vassar, but it certainly seems to exist when all the cases are read together.

*Miscellaneous Matters*

■ This court agrees that failure to promote is not a refusal to contract, within 42 U.S.C. § 1981. *Bennun v. Rutgers State University*, 941 F.2d 154 (3d Cir.1991) in any event, the same analysis which leads to dismissal of the Title VII claim would seem to justify dismissal of this claim.

No evidence supports a claim of retaliation for having taken am intramural appeal from the denial of promotion in 1989. This claim is dismissed.

■ The claimed violation of the Equal Pay Act, to the extent not time barred, also is not supported by sufficient evidence. Vassar has a structured salary plan based on seniority and a merit system. No two professors in the context of this case devote equal effort, skill, and responsibility under similar conditions. This claim is also dismissed.

Defendant's motion is granted. The Clerk shall file a final judgment.

SO ORDERED.

---

**3.** The *Fisher II* majority concurred in Judge Calabresi's observation on this point.

**4.** *See Fisher II,* 114 F.3d at 1386 (Newman Ch.J. dissenting)