Joseph FIERRO, Plaintiff,

v.

SAKS FIFTH AVENUE and Robert Perley, Defendants.

No. 97 CIV. 6385(CLB).

United States District Court, S.D. New York.

July 7, 1998.

David Rosoff, Carton & Rosoff, PC, Harrison, NY, for plaintiff.

Frances Mary Maloney, Epstein, Becker & Green, PC, New York, NY, for defendants.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Presently before the Court is defendants' motion for summary judgment fully heard and submitted on June 25, 1998, in this employment discrimination suit brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the New York Human Rights Law, N.Y. Executive Law §§ 296 *et seq.* ("NYHRL"). This case arises from the defendant retailer's discharge of plaintiff following his admitted theft and subsequent cover-up of an employee benefit worth $9.85. Accepting the retailer's strong business interest in deterring employee pilfering, discharging plaintiff on the basis of so trivial a sum may seem somewhat rigid. Yet, neither Title VII nor the NYHRL, impose liability for being overly rigid or even harsh. Those statutes simply make employers liable for *retaliation or discrimination,* neither of which are inferable on the record before us. For these reasons, as amplified below, defendants' motion for summary judgment is granted.

### Background

Plaintiff Joseph Fierro began working at Saks & Company ("Saks"), as a part-time clothing salesman in November of 1993. By all accounts, plaintiff was a good producer while at Saks, and rose up quickly through

the ranks. The sole alleged harasser in this case, Mr. Robert Perley, was the manager of the Men's Polo Department in Saks' Manhattan store and as such was plaintiff's supervisor. It is undisputed that Mr. Perley:

(1) was, in plaintiff's words, "very eager" to hire plaintiff as a full time employee in July of 1994, and in fact did so. *See* Fierro Dep. at 31–31; Plaintiff's Affidavit in Opposition to Motion for Summary Judgment, Doc. No. 15, at ¶ 3 (hereinafter "Fierro Aff.").

(2) created a special "Clothing Specialist" position for plaintiff, in November of 1994, so that plaintiff could receive a pay increase from $32,000 to $38,000. *See* Fierro Aff. at ¶ 4; Fierro Dep. at 38–39; Def. Exh. I;

(3) approved at least one other raise for plaintiff. *See* Def. Exh. J;

(4) consistently gave plaintiff very strong employee reviews. *See e.g.* Def. Exhs. K and L;

Plaintiff also received various additional raises while at Saks, presumably with Mr. Perley's approval, so that his salary increased from $30,000 per year when he began in full time employ in July of 1994, to $46,000 per year as of February 1996. Plaintiff testified that he did not feel discriminated against by Mr. Perley at any time prior to February of 1996. *See* Fierro Dep. at 43, 59–60.

On August 31, 1996, plaintiff forged the signatures of Mr. Perley, and Donna Ruffman, and entered Ms. Ruffman's employee identification number into an electronic cash register without authorization. He did this to obtain an improper employee discount on a shirt he had purchased for his wife. *See* Fierro Dep. at 56–57 and Def. Exh. S.

Saks' employee handbook provides that: The following list of prohibited conduct represents essential guidelines that are so fundamental to Saks Fifth Avenue's operation that such violations *must result in immediate dismissal:*

1. Theft of Saks Fifth Avenue or another associate's merchandise, property or services;

. . .

5. Forging a signature;

. . .

28. Ringing a transaction under another associate's number or on a dummy date line when doing so results in an unauthorized or unwarranted benefit to the associate ringing the transaction.

*See* Def. Exh. B. at 37–38 (emphasis added).

On September 10, 1996 Thomas Dolan and Vane Waller of Saks' Loss Prevention Department interviewed plaintiff about his August 31st transaction, after having noticed transaction irregularities pursuant to a routine cash register survey. *See* Transcript of Oral Argument. As recounted by Mr. Dolan in a contemporaneous memorandum:

When asked, [Mr. Fierro] said that one of his co-workers rang the return but then he rang the purchase. I then asked Fierro who authorized the return and he said that Rob Perley had a standing policy of allowing associates to sign his name as the authorized signature. At this point, I informed Fierro that it would be very easy to verify who actually rang the return, and suggested that if he wished to change his previous answer, this was the time. Fierro then ... admitted that he had forged [Donna Ruffman's] signature and also written in Rob Perley's name.

*See* Def. Exh. S; *see also* Def. Exh. R. (containing two different and conflicting written statements made by Mr. Fierro during the interview). Mr. Dolan's memorandum goes on to state that "Fierro's transaction resulted in a loss to Saks in the amount of $9.85." *Id.*

Mr. Fierro concedes that he changed his story during the interview, but testified that he "was under a lot of duress at the time." *See* Fierro Dep. at 116–118. With respect to the theft itself, in a second written statement given by Mr. Fierro at the interview, he admitted as follows:

I have received a copy of a handbook and I'm aware of procedures and rules in the handbook. On 8–31–96 @ 9.36 a.m. I rang a return for myself using Donna Ruffman's assoc. # . . . . because of my transaction, I realize I violated Saks policy. I did this

transaction in the morning to expedite the return so I could deal with the high volume of business we were expecting that day. I realize it was wrong to do this. I exercised poor judgment and I am truthfully sorry for what I did. I realize that something like this is wrong and it will never happen again.

*See* Def. Exh. R.

After being interviewed by the Loss Prevention Department, and after having submitted his written statements, Mr. Fierro returned to the Men's Polo Department to inform Mr. Perley of what had occurred. According to Mr. Perley, although he explained to Mr. Fierro that he had no control over the Loss Prevention Departments' decisions, he nevertheless made various phone calls on Mr. Fierro's behalf. Specifically, Mr. Perley claims to have called Mr. Dolan of the Loss Prevention Department, as well as Elizabeth Solem of the Human Resources Department, to express his opinion that Mr. Fierro was a good employee who had always worked hard. Mr. Perley did this, he claims, in an attempt to persuade Saks not to terminate Mr. Fierro. *See* Perley Dep. at 70–72. Mr. Fierro denies that Mr. Perley made any phone calls on his behalf. *See* Fierro Dep. at 121.

On September 13, 1996, Mr Fierro was informed by Patricia Keating and Elizabeth Solem of the Human Resources Department that he was terminated for violations of Saks' policies. At no time during this exit interview, did Mr. Fierro make any allegations with respect to discrimination of any kind. Instead, essentially he expressed his disbelief that an "exceptional employee" like himself could be fired for such a trivial transgression. *See* Fierro Dep. at 125. In a written statement submitted at his exit interview, Mr. Fierro stated:

1. It should be noted that the factual assertions contained in the Fierro Aff., and plaintiff's memorandum of law, (various portions of which are verbatim copies of each other), depart dramatically in many instances from Mr. Fierro's deposition testimony and even in some instances from his Complaint. For example, on this motion plaintiff argues that the transaction for which he was terminated was "completely authorized." Plaintiff's Mem. at 10. This flies in the face of plaintiff's numerous admissions, catalogued

I realize I made a mistake ... I was only trying to free up my time to allow myself to continue my goal of being the best salesman in my department.... I had no idea that this was going to be the end result. Security made it seem like this was going to be a slap on the wrist and nothing more.

*See* Def. Exh. T.[1] Although again, no express mention of discrimination is made, Mr. Fierro did make the following somewhat elliptical statement about Mr. Perley:

A number of questions involving this whole mess have popped up. Questions about signing of credits by Robert Perley and he said to sign his signature when he wasn't around. He claims not. It was always the case.

*See id.* Mr. Perley was not at work on the day Mr. Fierro was terminated, an absence which Mr. Fierro now finds very suspicious.

After being terminated on September 13, 1996, Mr. Fierro had no further contact with any Saks employee until the spring of 1997. At some point in or around May of 1997, Mr. Fierro was pursuing employment with a financial services company called Key Management. *See* Fierro Dep. at 133. In connection with his application to that company, Mr. Fierro telephoned Elizabeth Solem of Saks' Human Resources Department. According to Mr. Fierro:

She had originally told me that the only thing that would be done was there would be a verification of dates and that's it, nothing else would be given out. So I called her up about that and she basically changed that.... [She told me] [t]hat if they were asked how I was let go from Saks, they would tell what had happened.

*Id.* at 131–132. Ultimately, Mr. Fierro claims to have been offered a job by Key

above, to the effect that: "I realize I violated Saks policy.... I realize that something like this is wrong." *See* Def. Exh. R; *see also* Fierro Dep. *passim* and especially at 98, 100, 130 (admitting forgery); Complaint at ¶ 12 (admitting "minor rules infractions"). Numerous other examples of such inconsistencies are recited in defendants' moving papers, particularly defendants' reply memorandum of law, which in the interests of brevity, the Court declines to repeat.

Management in May or June of 1997, but declined to accept because of unacceptable financial terms. *Id.* at 133.

On May 16, 1997, Mr. Fierro commenced this action by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Def. Exh. U. Seven weeks later on July 3, 1997, the EEOC issued a Notice of Right to Sue, and plaintiff filed this action on October 9, 1997. *See* Def. Exh. V.

In this lawsuit, Mr. Fierro alleges that Mr. Perley discriminated against him because he is an Italian American, and because Mr. Perley is a white Anglo–Saxon protestant ("W.A.S.P.").[2] Mr. Fierro alleges, and Mr. Perley denies, that in June of 1996 Mr. Perley called him "a W–O–P" after he had gotten a haircut. *See* Fierro Aff. at ¶ 11; Perley Dep. at 50.[3] Mr. Fierro alleges, and Mr. Perley denies, that Mr. Perley also called him "Joey Buttafuoco"[4] in "January or February of 1996" and repeated "the slur four or five times between January and June 1996." *See* Fierro Aff. at ¶ 9; Defendants' Mem. at 26. Mr. Fierro alleges, and this time Mr. Perley acknowledges, that Mr. Perley called him "a Cadillac salesman" after he caught him chewing gum on the sales floor of the Men's Polo Department. *See* Fierro Dep. at 89–90. The "Cadillac Salesman" comment was, according to Mr. Fierro, repeated "several times from 1995 through August, 1996." Fierro Aff. at ¶ 10. Mr. Fierro also contends that Mr. Perley acted toward employees who were neither of Italian or Hispanic descent "in a much more friendlier fashion." Fierro Dep. at 159–161.

The major incident which plaintiff relies upon for his charges of harassment occurred when he received a telephone call from his wife while he was eating lunch in Mr. Perley's office. *See* Plaintiff's Mem. at 3; Fierro Dep. at 77. According to Mr. Fierro, his wife, who Mr. Perley knew to be an Hispanic, wanted Mr. Perley to go on a blind date with one of her friends. When this request was relayed to Mr. Perley, he responded by asking "does she have a green card," and allegedly stating that "I won't go out with an illegal alien." *See* Fierro Dep. at 78–80; Fierro Aff. at ¶ 19; Perley Dep. at 53. Mr. Fierro's wife apparently then began to cry, and Mr. Fierro became enraged, calling Mr. Perley "a fucking asshole." Fierro Dep. at 81–83; Perley Dep. at 53. Ultimately, the two men exchanged apologies, shook hands, and continued with their work. *See* Fierro Dep. at 86; Perley Dep. at 55–56. Although, plaintiff's affidavit and memorandum assert that this incident occurred in July of 1997, plaintiff testified that it actually occurred "somewhere around" June of 1997. *See* Fierro Aff. at ¶ 18–19, Plaintiff's Mem. at 3–4 and Fierro Dep. at 78–79. Plaintiff cites to no witnesses which would in any way corroborate any of his allegations.

The Complaint asserts that "Perley expected Plaintiff to accept the discriminatory comments toward his national origin and that of Plaintiff's wife, who is Hispanic.... When Plaintiff told Perley that these comments were unacceptable, Perley commenced a plan to terminate Plaintiff." Complaint at ¶¶ 18–19.

Apart from evidence relating to himself specifically, plaintiff also alleges that Mr. Perley referred to a female African American employee as "mama," and to an Hispanic

---

**2.** Mr. Perley, in fact, identifies himself as of "English, Irish, and some Scandinavian" heritage. *See* Perley Dep. at 52.

**3.** Defendants contend that: "The term 'wop' is an anachronism (sic: should be acronym) that stands for 'without papers' used to refer to illegal immigrants." Def. Mem. at 26 n. 13. According to the Court's view the source is the Sicilian word *guappo* in which the "g" is soft, meaning originally a tough brave man, but used by Italians as a derogatory term for Sicilians. American Dictionary of Slang at 587 (2d ed.1975). In this country, the term became common early in this century at which time it usually implied an illiterate Italian immigrant working as a day laborer. *Id.* at 587. At that time no papers were necessary, apart from a steamship ticket and a desire to work hard and become an American.

**4.** Mr. Buttafuoco was the archetypal married man who indulged in a highly publicized amorous relationship with an underage woman. Somewhat anomalously in these modern times, Mr. Buttafuoco incurred much popular antipathy for his indiscretions, and the Court accepts as true plaintiff's contention that the appellation "Joey Buttafuoco" was not a complimentary one, if indeed it was in fact used by Mr. Perley.

employee as "a little spic." *See* Fierro Aff. at ¶ 13, ¶ 17. Plaintiff also alleges that at one point Mr. Perley stated "I'm a W.A.S.P. We don't like anybody. We only like animals." *Id.* at ¶ 16. Mr. Perley denies these allegations. *See* Perley Dep. at 58–59. The record does suggest however that Mr. Perley oversaw a department which, though remarkably diverse, did not adhere to the highest standards of decorum.[5] For example, one employee—Fred Kogan—is alleged to have named himself, and to have been called by others, including Mr. Perley: "Sissy Kay" and the "Queen of the Jews." These appellations were apparently intended to be humorous references to Mr. Kogan's homosexuality and Jewish ancestry. *See* Perley Dep. at 57–58. According to Mr. Fierro, he did not participate in this intended humor and he denies ever making any comments to Mr. Kogan concerning his sexual orientation. *See* Fierro Dep. at 66, 191. Nor, according to Mr. Fierro, did he ever make any insensitive references to various other employees' national origin. *Id.* at 66, 191–192.

Mr. Fierro testified that although he believed that he was being subjected to "a hostile environment" after June of 1996, he chose not to complain about it to Mr. Perley. Nor did he ever complain to anyone in Saks' human resources department about Mr. Perley's behavior, despite being aware of Saks' complaint procedures. *See* Fierro Dep. at 66–67. Mr. Fierro testified that though he felt that he "should have" complained about what he perceived to be Mr. Perley's misconduct he declined to do so, because according to him: "I was afraid of repercussions. If you start to conflict with your manager, before you know it its not a very pleasant outcome." *Id.* at 163. Mr. Fierro also testified that he did not inform his wife of much of Mr. Perley's allegedly abusive behavior toward him because "I didn't take the job home with me." *Id.* at 93. Finally, when he was informed that he was being terminated, plaintiff did not complain that he perceived reasons for his termination to be discriminatory. Plaintiff cites to no witnesses to whom

he made contemporaneous complaints of discrimination or harassment.

As a result of being the victim of Mr. Perley's alleged discrimination and harassment, plaintiff claims that his career has been severely damaged. Complaint at ¶ 27. In particular, plaintiff claims to have "suffered permanent psychological damage" as a result of Mr. Perley's conduct. *Id.* at ¶ 26. Specifically, plaintiff now suffers from "a very low personal esteem" together with "many sleepless nights." Fierro Dep. at 155–58. Mr. Fierro's foremost complaint appears to have arisen in connection with being called a "W–O–P." According to plaintiff: "I think every time I look in the mirror I see those three letters above my head and it really hurts." *See* Fierro Dep. at 155–56.

### Discussion

Summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c), *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–328, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 585–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of material fact exists if the evidence in the record would allow a reasonable jury to return thereupon a verdict for the non-movant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the non-movant. *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). In employment discrimination cases, our Court of Appeals has warned that district courts "must be cautious about granting summary judgment to an employer when ... its intent is at issue." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994).

In this case, plaintiff claims: (1) that he was terminated because Mr. Perley and Saks

---

**5.** Saks has an enviable record for diversity. The department in which plaintiff worked was staffed with men and women of African–American, His-

panic, Irish, Jewish and Italian descent, as well as homosexuals. *See* Fierro Tr. at 66, 69, 191; Perley Dep. at 83, 84.

discriminated against him on the basis of his Italian–American heritage; and/or (2) that he was terminated in retaliation for his decision to stand up to Mr. Perley's discriminatory treatment of him; and (3) that he was subjected to a hostile work environment prior to his termination.

■ Each of these claims is advanced pursuant to both Title VII and the NYHRL. Because discrimination claims brought under the NYHRL are treated in an identical manner to those brought under Title VII, an analysis of plaintiff's Title VII claims suffices for purposes of both the state and the federal statutes. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995).

## A. Retaliatory and or Discriminatory Discharge

■ "To establish a *prima facie* case for retaliation, a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). To establish a *prima facia* case for discriminatory termination plaintiff must show (1) that he belonged to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that the circumstances under which he was discharged give rise to an inference of discrimination. *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

To promote an expeditious resolution of this case, the Court will follow the suggestion of an increasing number of district courts in this Circuit which have proceeded directly to the real issues presented by a plaintiff's claims, by simply conceding in the abstract

the existence of a *prima facia* case, thereby bypassing the much criticized minuet or burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506, 515 (S.D.N.Y.1998) (stating that the *"McDonnell–Douglas* test has outlived its usefulness" and assuming *prima facia* case) (citing *Jalal v. Columbia University,* 4 F.Supp.2d 224, 234 (S.D.N.Y.1998) (declining to "dance mechanistically through the *McDonnell–Douglas* and *Price Waterhouse [v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ] 'minuets' " and proceeding to ultimate issue); *Padob v. Entex Information Serv.,* 960 F.Supp. 806, 812 (S.D.N.Y.1997) (refusing to "linger long on the first two stages of this analysis" and "turn[ing] directly" to the third stage); *Jugueta v. Perry,* 1997 WL 742535, at \*4 (S.D.N.Y. Dec.1, 1997); *Bumpus v. Runyon,* 1997 WL 539924 at \*9 (S.D.N.Y. Aug. 28, 1997); *Owens v. Waldorf–Astoria Corp.,* 1997 WL 251556 at \*3 (S.D.N.Y. May 13, 1997); *Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144, 155 (N.D.N.Y.1997); *Holmes v. United Airlines, Inc.,* 1996 WL 560193 at \*6 (S.D.N.Y. Jan.2, 1996); *Coleman v. Runyon,* 898 F.Supp. 223, 226 (S.D.N.Y.1995), *aff'd,* 101 F.3d 681, 1996 WL 167853 (2d Cir.1996)); *see also Bickerstaff v. Vassar College,* 992 F.Supp. 372, 374 (S.D.N.Y.1998) (assuming *prima facia* case).[6]

■ The *McDonnell Douglas* "minuet" having been disposed of, what remains for resolution here is the underlying substantive issue of the case. *Jalal,* 4 F.Supp.2d at 234. That issue is whether Saks' proffered justification for Mr. Fierro's termination was "merely a pretext" for retaliation or discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This Court concludes that it was not, and that no reasonable juror could find that it was, based on the totality of the evidence.

---

6. Because of the confusion inherent in the *McDonnell Douglas* analysis, some courts have simply stated that the *de minimis* standard applicable to the determination of whether a *prima facia* case has been established applies throughout the entire summary judgment analysis. *See*

*e.g., Jimoh v. Ernst & Young,* 908 F.Supp. 220, 223 (S.D.N.Y.1995) ("A plaintiff's burden to defeat summary judgment is to produce *de minimis* evidence in opposition to the movant's claim that there are no triable factual issues."). *Cf.* Fed. R.Civ.P. 56(c).

■ Defendants contend, and the Court agrees, that Mr. Fierro was terminated because "he stole from Saks." Def. Mem. at 2. Our Court of Appeals has made it clear that an "employee may be discharged 'on the basis of subjective business judgments, for any reason that is not discriminatory.'" *Thornley v. Penton Publishing,* 104 F.3d 26, 29 (2d Cir.1997) (quoting *Stanojev v. Ebasco Servs., Inc.,* 643 F.2d 914, 921–22 (2d Cir. 1981)). It is true that Saks' dollar loss resulting from Mr. Fierro's theft may have been relatively trivial, and that a jury might well feel sympathy for Mr. Fierro in that he was actually fired rather than punished with "a slap on the wrist and nothing more" as he apparently wished to be. *See* Def. Exh. T. Yet, as noted above, even discounting a retailer's strong business interest in deterring employee pilfering, neither Title VII nor the NYHRL impose liability on Saks for being overly rigid or even harsh. Those statutes simply make Saks liable for *retaliation or discrimination,* neither of which can possibly be said to be inferable on the record before us. *See Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998).

■ Before assessing plaintiff's substantive challenges to this conclusion, the Court will address plaintiff's contention that summary judgment may not be granted where intent is at issue. In what apparently represents a tacit acknowledgment that plaintiff's sworn deposition testimony dramatically contradicts the subsequent factual assertions made in the papers submitted on this motion,[7] plaintiff's memorandum of law argues that:

. The Second Circuit has explored the circumstances under which summary judgment could be granted and determined that a plaintiff's credibility should be left to the decision of the jury. This is true even where the plaintiff's deposition testimony might seem improbable or "fantastic."

*See* Plaintiff's Memorandum of Law at 8 (citing *Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir.1946)).

■ The Court agrees that issues of intent and credibility are primarily within the province of the jury. In *Gallagher v. Delaney,* our Court of Appeals explained that an "Article III judge is not a hierophant of social graces," because she or he generally lacks the "current real life experience" required to interpret the "subtle ... dynamics of the workplace." *See* 139 F.3d 338, 342, 347 (2d Cir.1998). Thus, "trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996).

In the circumstances of this case, however, the argument that summary judgment may not be granted because Saks' intent has been raised as an issue effectively amounts to a contention that summary judgment is *never* available in employment discrimination cases. Plaintiff apparently urges such a rule even where, as here, there has been a complete failure of credible proof, and an admission of fraud sufficient to support discharge under the employer's clear published policies. Our Court Appeals has flatly rejected such a rule. *See McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994)(emphatically reaffirming availability of summary judgment in employment discrimination cases). Indeed, as Judge Calbresi wrote recently in distinguishing *Gallagher,* although employment discrimination cases are usually for the jury, "a jury cannot infer discrimination from thin air." *Norton,* 145 F.3d at 119. In sum, this Court declines to allow plaintiff's mere incantation of intent to "operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ An employer's proffered reason for termination "cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Gallo,* 22 F.3d at 1225 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in

7. *See supra* note 1. Again, numerous examples of such material contradictions are recited in defendants' moving papers, which the Court declines to repeat here.

original)). In this case, plaintiff has shown neither.

Plaintiff attempts to demonstrate pretext by contending that he "was terminated for a minor rules infraction when similarly situated individuals received little or no discipline for far more serious infractions." Complaint at ¶ 12. Analysis of plaintiff's deposition testimony reveals that there were only two such "similarly situated individuals." The first, according to Mr. Fierro, was an unnamed interne who "had lost . . . one of the register bags or they had accused her of taking it and nothing was done to her about that." Fierro Dep. at 144. An interne who allegedly lost a bag can hardly be said to have been "similarly situated" to Mr. Fierro, a full time employee who admitted to forging a fellow employee's signatures to commit petty embezzlement. Even if the interne were "similarly situated," Mr. Fierro has failed after full discovery to demonstrate or even allege with a credible degree of certainty, that the interne was not in fact fired. *See* Fierro Dep. at 146.

The second "similarly situated individual" plaintiff proffers in support of his pretext argument is someone named "Mark," who was caught booking credits to his own account. The Court agrees that such misconduct is substantively similar to that committed by Mr. Fierro, in that both resulted in illicit pecuniary gain. Yet we fail to see how the "Mark" example furthers Mr. Fierro's pretext argument. As Mr. Fierro acknowledged in his deposition, Mark, like Mr. Fierro, *was terminated for his transgression.* Fierro Dep. at 145.

Plaintiff's final effort to establish pretext comes with the argument that while he was terminated for violating Saks's return procedures, Mr. Perley "a white, Anglo–Saxon Protestant . . . was neither disciplined nor terminated when he engaged in serious and widespread violations of the sales and return procedures." Plaintiff's Mem. at 6. This conclusory assertion finds no support in the record whatsoever. Apparently, because Mr. Perley as a manager, was authorized by Saks to use his subordinates' identification numbers to enter transactions on their behalf, Mr. Fierro now believes that he was entitled to use his co-employee Ms. Ruffman's number without her permission, to realize monetary gain for himself at Saks' expense. The fact that Saks choose on the one hand to allow Mr. Perley to use others' identification numbers to effect efficient sales, and on the other hand to fire Mr. Fierro for petty embezzlement, is quite obviously a business judgment rather than a pretext. *See Thornley,* 104 F.3d at 29. As such, it cannot be actionable.

In addition to failing to show pretext, plaintiff has not made even a threshold showing that either retaliation or discrimination were the real reasons for his termination. The Complaint asserts that because of his allegedly anti-Italian animus and desire to retaliate against Mr. Fierro, Mr. Perley "commenced a plan to terminate Plaintiff." Complaint at ¶ 19. Yet, beyond this conclusory assertion, plaintiff has failed to present any evidence whatsoever which would in any way tie Mr. Perley to his discharge.

Plaintiff makes much of the fact that Mr. Perley was absent on the day of this termination. There are many explanations for this, and the Court fails to see how it suggests that Mr. Perley somehow orchestrated plaintiff's termination. The Court agrees that plaintiffs are seldom able, and indeed are not required to produce direct evidence of employment discrimination. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir. 1997). In this case, however, drawing all inferences in plaintiff's favor, the most that can be said about Mr. Perley's absence on the day of plaintiff's termination is that Mr. Perley wished to avoid the discomfort of seeing a formerly favored employee fired for cause as a result of a written company policy. Absolutely no evidence in the record suggests that Mr. Perley somehow impelled plaintiff's termination.

In sum, the evidence supporting plaintiff's wrongful discharge claims under both Title VII and the NYHRL is so scant that no rational jury could find in his favor. *Chertkova,* 92 F.3d at 86 (citing *Gallo,* 22 F.3d at 1224). Because plaintiff has failed to set forth any genuine issues of material fact with respect to those claims, they are hereby dismissed.

## B. Hostile Work Environment

### 1. The *Faragher/Burlington* Affirmative Defense

On June 26, 1998, in the twin cases of *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, ——, 118 S.Ct. 2257, 2261, 141 L.Ed.2d 633 (1998), the Supreme Court announced that although that an employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor" in certain circumstances "a defending employer may raise an affirmative defense to liability or damages." *Faragher,* —— U.S. at ——, 118 S.Ct. at 2278, 141 L.Ed.2d at ——. According to the Court, that affirmative defense comprises two necessary elements:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.*[8] Although potentially very broad in application, the Court went on to limit this newly formulated affirmative defense by cautioning that it is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.*

 While this case does involve an actual discharge, this Court concludes that the *Faragher/Burlington* affirmative defense is nevertheless available to Saks for the limited purpose of negating plaintiff's hostile work environment claim.

As discussed above, in this case, Mr. Perley's alleged harassment did not "culminate" in plaintiff's discharge. Discounting the disingenuous representations found in the briefs, the undisputed evidence in this case, including Mr. Fierro's own deposition testimony, establishes that Mr. Perley had nothing whatsoever to do with Mr. Fierro's discharge, which was in fact caused solely by his own petty embezzlement. Yet, the legitimacy of Mr. Fierro's discharge alone does not prevent him from seeking to recover for the hostile work environment allegedly suffered prior to that discharge. That is clearly a discrete claim, which in the unique circumstances of this case is unrelated either factually or doctrinally to Mr. Fierro's actual discharge.[9] In other words, in this case the hostile work environment and discriminatory discharge claims are not related, because the alleged hostile work environment did not "culminate" in the discharge. *See Faragher,* —— U.S. at ——, 118 S.Ct. at 2279, 141 L.Ed.2d at ——. Thus the Court concludes that the *Faragher/Burlington* affirmative defense is available to Saks with respect to Mr. Fierro's hostile work environment claim alone. As explained by the Supreme Court, in determining whether an employer has met the first element of the *Faragher/Burlington* affirmative defense—that the employer exercised reasonable care to prevent and correct promptly any harassing behavior—the employer's promulgation of an "an antiharassment policy with complaint procedure" is an important, if not dispositive, consideration. *Faragher,* —— U.S. at ——, 118 S.Ct. at 2279, 141 L.Ed.2d at —— ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."). In this case, it is undisputed that Saks had an antiharassment policy, and that complaint procedures were readily available to Mr. Fierro. Accordingly, the Court concludes that

---

**8.** It should be noted that the Supreme Court did not focus on the *McDonnell Douglas* burden shifting framework in either of the *Faragher* or *Burlington* opinions. While it might be too much to hope that the Court's omission in that regard signals an abandonment of the "minuet" entirely, it is unclear whether the Court intended that the *Faragher/Burlington* affirmative defense add yet another level to the *McDonnell Douglas* framework, or whether the Court articulated the affirmative defense as an independent or alternative analysis.

**9.** In this case, the discharge claim is rather uniquely foreclosed by a non-pretextual and legitimate justification—i.e., stealing—so that summary judgment may be granted as to that claim.

Saks has met the first element of the affirmative defense.

■ The second element of the *Faragher/Burlington* defense—whether "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer"—provides, in this Court's view, the crucial inquiry. In this case, it is undisputed that Saks provided to plaintiff the opportunity to invoke procedures that could have remedied the perceived harassment. Plaintiff testified that though he was aware that Saks had a complaint procedure—in his words "most big companies do"—he declined to avail himself of it, because: "I was afraid of repercussions. If you start to conflict with you manager, before you know it its not a very pleasant outcome." Fierro Dep. at 163. In light of this testimony, the second element of the *Faragher/Burlington* analysis requires a determination of whether Mr. Fierro's apparent fear of repercussions and an unpleasant outcome reasonably deterred him from taking advantage of Saks' complaint procedures. As a matter of law, this Court holds that such generalized fears can never constitute reasonable grounds for an employee's failure to complain to his or her employer.

■ "Although Title VII seeks 'to make persons whole for injuries suffered on account of unlawful employment discrimination,' its 'primary objective,' like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm.'" *Faragher,* —— U.S. at ——, 118 S.Ct. at 2292, 141 L.Ed.2d at —— (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Today, as Mr. Fierro testified "most big companies" have complaint procedures through which they seek to prevent the harm of discrimination, if for no other reason than to avoid the costs of litigation. Such procedures are of course useless if the affected employees fail to avail themselves of them. At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment. Without such a requirement, it is difficult to see how Title VII's deterrent purposes are to be served, or

how employers can possibly avoid liability in Title VII cases. Put simply, an employer cannot combat harassment of which it is unaware.

■ In the Court's view, the *Faragher* and *Burlington* opinions synthesize these principles into a long overdue rule. That rule is simply that Title VII plaintiffs must at least make reasonable efforts to seek redress for any perceived harassment through the employer before initiating a lawsuit in federal court. As both opinions expressly state, a showing of "*any* unreasonable failure [by the employee] to use *any* complaint procedure provided by the employer ... will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher,* —— U.S. at ——, 118 S.Ct. at 2293, 141 L.Ed.2d at ——; *Burlington,* 118 S.Ct. at 2270 (emphasis added).

In this case, Mr. Fierro asks that we excuse his failure to complain on the grounds that he feared unspecified repercussions and an unpleasant outcome. Yet, every employee who feels harassed by a supervisor will at some level fear the inevitable unpleasantness which will result from complaining to the employer. Confrontation is by its very nature unpleasant. However, to allow an employee to circumvent the reasonable complaint requirements of *Faragher* and *Burlington* by making conclusory allegations of feared repercussions, would effectively eviscerate an affirmative defense which the Supreme Court clearly went to great effort to craft in order to stem the tide of unwarranted lawsuits.

Here, Mr. Fierro does not specify what repercussions he feared other than his general statement that conflict with one's manager leads to unpleasantness. Nor does Mr. Fierro cite to other employees who were subjected to retaliation because they availed themselves of Saks' complaint procedures. Finally, in addition to never mentioning the alleged harassment to his wife, Mr. Fierro did not make any mention of it when informed that he was to be terminated, circumstances which would appear to have rendered moot any fears of repercussions. For this Court, these facts confirm that any perceived

harassment during Mr. Fierro's employment was so only by reason of its potential utility for this litigation.[10]

In sum, this Court holds that a plaintiff may not rebut the *Faragher/Burlington* affirmative defense established by a defendant employer with the type of conclusory assertions of fear of repercussions made here. Such assertions do not create genuine issues of material fact with respect to the reasonableness of an employee's failure to complain. Accordingly, the Court determines that defendant Saks has established the *Faragher/Burlington* affirmative defense, and that defendant Saks' motion for summary judgment must be granted with respect to plaintiff's hostile work environment claim brought pursuant to Title VII and the NYHRL.

### 2. *No Hostile Work Environment Actually Existed*

■ The *Faragher/Burlington* affirmative defense may only be available to employers. In *Tomka v. Seiler,* 66 F.3d 1295, 1313, 1317 (2d Cir.1995), our Court of Appeals held that while individual defendants may not be held personally liable under Title VII, individual defendants may be sued in their personal capacities for harassment under the NYHRL. Thus, notwithstanding our conclusion that the defendant employer Saks has established the *Faragher/Burlington* affirmative defense, there remains open for adjudication the motion of the individual defendant, Mr. Perley, on plaintiff's claim for hostile work environment brought pursuant to the NYHRL. After careful consideration, this Court has concluded that summary judgment must be granted in favor of both Mr. Perley and Saks with respect to plaintiff's hostile work environment claim under both Title VII and the NYHRL, on the alternative and independent ground that plaintiff has totally failed to adduce any competent proof in support of that claim.

A hostile work environment exists " 'when the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' "

*Torres v. Pisano,* 116 F.3d 625, 630–31 (2d Cir.1997) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it." *Gallagher v. Delaney,* 139 F.3d 338, 346 (2d Cir.1998) (citing Harris, 510 U.S. at 21–23, 114 S.Ct. 367; *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)).

Plaintiff's hostile work environment claim is founded exclusively on: (1) Mr. Perley allegedly calling him a "WOP"; (2) Mr. Perley calling him "a Cadillac salesman" (3) Mr. Perley allegedly calling him "Joey Buttafuoco," (4) Mr. Perley asking him whether his wife's friend had "a green card"; (5) Mr. Perley allegedly being less friendly to him relative to non-Italian and non-Hispanic employees; and (6) Mr. Perley's alleged use of racial epithets with respect to other employees.

■ Before assessing the substance of these allegations, a threshold procedural consideration must be addressed. According to Mr. Fierro's own deposition testimony, all of the allegedly abusive incidents directed at him occurred in the seven months between February of 1996 and his termination in September of 1996. *See* Fierro Dep. at 59–60. This testimony raises the issue of the timeliness of the filing of his charge of discrimination with the EEOC. Under Title VII, a party in a "deferral" state such as New York must file such a charge within 300 days of the alleged discriminatory employment practice. *See* 42 U.S.C. § 2000e–5(e). As a result, only events that occurred within the 300-day period prior to filing are actionable under Title VII. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir. 1996). In this case, because plaintiff filed his charge of discrimination with the EEOC on May 16, 1997, the 300-day period began on July 19, 1996.

Much of the harassment complained of by Mr. Fierro occurred, by his own allegations,

---

**10.** The fact that plaintiff initiated this lawsuit in and around the time when Saks refused to give him an employment reference is hardly a coincidence.

before July, 19, 1996 and is therefore clearly time barred. For example, Mr. Fierro alleges that the "W–O–P" comment was made in June of 1996, and that the "Joey Buttafuoco" comment was first made in "January or February of 1996" and was repeated "four or five times between January and June 1996." *See* Fierro Aff. at ¶ 9 and ¶ 11. The law in this Circuit prohibits plaintiff from recovering for these alleged incidents. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997) (holding that a pre-termination salary claim was time-barred); *Van Zant,* 80 F.3d at 712–13 (holding that various of plaintiff's claims were time-barred); *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir. 1993) (holding that a promotion claim was time-barred); *Butts v. City of New York Dep't of Housing,* 990 F.2d 1397, 1401 (2d Cir.1993) (holding that two of plaintiff's five promotion claims were time-barred).[11]

With respect to the timing of the "green card" remark made by Mr. Perley—an apparently derogatory comment on the citizenship status of plaintiff's wife's friend—plaintiff's position has been inconsistent. As noted above, while plaintiff's affidavit and memorandum assert that this incident occurred in July of 1996, plaintiff testified that it actually occurred "somewhere around" June of 1996. *See* Fierro Aff. at ¶ 18–19, Plaintiff's Mem. at 3–4 and Fierro Dep. at 78–79. Although it is highly unlikely that the green card remark was made on or after July 19, 1996, because this is a summary judgment motion in which all ambiguities must be resolved in favor of plaintiff, the Court will assume without deciding that the "green card" comment is not time-barred. The Court also determines that plaintiff is not time barred from seeking to recover for the "Cadillac" comment which

he contends was made repeatedly through August of 1996. *See* Fierro Aff. at ¶ 10.

In any case, even if the Court were to consider all of plaintiff's allegations as being timely made, as a substantive matter no hostile work environment can be said to exist on the facts of this case. Given the dramatic inconsistencies between plaintiff's deposition testimony and his moving papers as well as counsel's factual assertions at oral argument, it is not at all clear that many of the incidents Mr. Fierro complains of even occurred. Though Mr. Perley acknowledges the "Cadillac" and "green card" remarks, the other incidents of harassment are based solely on plaintiff's unsupported, conclusory and frequently contradictory allegations. To accept these unsupported allegations as true, one would have to infer that Mr. Perley hired Mr. Fierro, consistently approved his raises and repeatedly gave him positive reviews, solely so that he could subject him to harassment. No reasonable jury could possibly draw such an inference.

Even accepting Mr. Fierro's conclusory allegations as true, the alleged harassment complained of in this case was not subjectively perceived as such by plaintiff at any time relevant to the Complaint. Plaintiff's failure to complain in this case not only establishes the first element of the *Faragher/Burlington* affirmative defense, it also is proof that plaintiff lacked the subjective perception of harassment necessary to prevail on a hostile work environment claim. *See Gallagher,* 139 F.3d at 346.

In any case, "[c]onduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.'"

11. The untimeliness of plaintiff's filing may not be excused under the so-called "continuing violation exception." As explained by our Court of Appeals:

The continuing violation exception applies to cases involving specific discrimination policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests. However, multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.

*Lambert,* 10 F.3d at 53 (internal citations omitted); *see also Lightfoot,* 110 F.3d at 907 ("Discrete incidents of discrimination that are unrelated to an identifiable policy ... 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'" (quoting *Van Zant,* 80 F.3d at 713)).

*Torres,* 116 F.3d at 631 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). Thus, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity,' meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (1997) (quoting *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986) (other quotations omitted)).

Applying these principles, the Court determines that even if we were to assume both the timeliness and the truth of plaintiff's allegations in this case, such allegations do not give rise to a claim of hostile work environment harassment. At worst, the alleged acts are merely isolated, offensive comments that objectively do not entitle Mr. Fierro to relief as against Saks or Mr. Perley under either Title VII or the NYHRL.

### Conclusion

For all of the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk shall file a final judgment.

SO ORDERED.