Paulette B. **HYLTON**, Plaintiff,

v.

**NORRELL HEALTH CARE OF NEW YORK**, Defendant.

No. 97 Civ. 8558(RWS).

United States District Court, S.D. New York.

June 18, 1999.

---

Jaroslawicz & Jaros, New York City (Robert J. Tolchin, of counsel), for plaintiff.

Vandenberg & Feliu, New York City (Alfred G. Feliu, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Norrell Health Care of New York ("Norrell"), a provider of health care services, has moved under Rule 56, Fed. R.Civ.P. for summary judgment dismissing the complaint of plaintiff Paulette B. Hylton ("Hylton"), a home health aid ("HHA") who has alleged unlawful sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Based upon the findings of fact and conclusions of law set forth below, the motion of Norrell is granted and the complaint dismissed. This motion has presented somewhat customary claims arising out of a relationship which has defeated Hylton's ability to establish causality.

### Prior Proceedings

Hylton, acting *pro se,* filed the complaint on November 13, 1997. Paragraph 8 of the complaint alleges:

> On August 8, 1995 I reported the office Norrell of sexual harassment [sic] insident [sic] that take place on the job I was working to me by the pt. son After reporting insident [sic] I was accuse to be the one harrassing [sic] The son I was retaliating against by not getting any assigment [sic] regularly. I have to tell Them I going to human Right. I was refuse of my W2 form for that year. I was refuse work reference. Reference send out was told I was fire from Job.

A pretrial conference was held on July 24, 1998 at which Hylton was represented by her current counsel. The parties ex-

changed documents and interrogatories, and depositions have been noticed and conducted. The instant motion was deemed fully submitted on March 17, 1999.

### The Facts

The facts are established by the 56.1(a) Statements of the parties and their supporting materials and are not disputed except as noted below.

### The Parties

Norrell is a temporary staffing agency with offices throughout the country. Norrell, sued as defendant Norrell Health Care of New York, is a subsidiary of Norrell Corporation and places temporary workers in the health care industry. One of the major positions Norrell staffs is the home health aid position.

One of Norrell's most important customers is Visiting Nursing Services ("VNS") with whom Norrell has a subcontract by which Norrell places its HHAs with VNS patients. A significant percentage of Norrell's revenue is derived from business provided by VNS. Pursuant to the agreement between Norrell and VNS, Norrell supplies qualified HHAs who are in compliance with the requirements under state law for placement with a VNS client. The patient remains a client of VNS, and VNS manages all services to the patient. Norrell is required to report any problem to VNS and to assist VNS in conducting any investigation. HHAs are instructed to report any problems with patients to Norrell, and Norrell has an on-call coordinator available twenty-four hours a day to receive inquiries from HHAs.

Hylton is a female HHA who was employed by Norrell in 1980. She has sought long term assignments to maximize her earnings to enable her children to rejoin her here in the United States. She left Norrell in 1990 to join a competitor, Health Force, because Norrell had "no case immediately" for her. Hylton was fired by Health Force in 1993 for abandoning a patient and then reapplied for a position with Norrell. Hylton completed and signed a Norrell employment application dated March 27, 1993 and attested that the information contained in the application was "true to the best of my knowledge and belief." She also acknowledged that any "misrepresentation or omission of facts called for on this application is cause for dismissal."

In response to the question on Norrell's employment application regarding the reasons for leaving Health Force, Hylton answered, "Did not have the hours to accommodate me," when, in fact, at the time she entered this information she had been fired for abandoning a patient.

### Norrell Employment Practices

Norrell service coordinators place HHAs with patients. In 1995, Norrell employed approximately ten service coordinators in the office from which Hylton worked. Upon receiving an assignment, a service coordinator searches Norrell's data banks for active HHAs who might be able to fulfill the assignment. Norrell considers an HHA to be "active" if she is in compliance with all regulatory requirements and has worked for Norrell within ninety days. Upon finding an active HHA in the computer data bank, the service coordinator then attempts to contact HHAs by telephone and to assign the case to the first available HHA. Assignments for HHAs vary in length from one shift to many months, depending on the needs of the patient, the number of hours a day or week to fulfill the assignment, and the availability of the HHAs.

As service coordinators make assignments on a first come/first served basis, the reliability and availability of an HHA and his or her willingness to accept assignments are important factors in a service coordinator's decision to assign a case to an HHA.

### The Sexual Harassment Incident

In 1995, Hylton was assigned to a VNS patient, Florence Alfieri, for a five month period, which was as long an assignment as Hylton had while employed at Norrell.

Ms. Alfieri was a frail, elderly patient in a wheelchair who, according to Hylton, "needed care." Hylton now alleges that Ms. Alfieri's elderly son made sexually suggestive comments to her prior to August 7, although on deposition she stated the first such conversation took place on August 7, 1995. She did not report to Norrell concerning these alleged conversations prior to August 7. On August 4, 1995, another HHA attending Ms. Alfieri complained to a Norrell coordinator about sexual harassment by the son. Hylton was asked that same day if she had any problems with the son and answered that she did not.

On August 7, 1995, the day before Hylton's assignment was to end, Ms. Alfieri's elderly son made sexually suggestive remarks to Hylton, groped her and sought to have a sexual encounter which Hylton forcibly resisted. Although Hylton decided that morning that she would not return to the Alfieri home the next day, she did not contact Norrell to report the incident or to notify a service coordinator of her decision. She finished her shift that day and the next morning informed Norrell about the incident. Norrell immediately informed VNS and found another HHA to relieve Hylton for the last shift of the Alfieri assignment. VNS sent a nurse to the Alfieri home that day to investigate the matter. Hylton did not return to the Alfieri home after making her complaint on August 8, 1995.

Hylton testified that no Norrell employee sexually harassed her and that she had never before complained of sexual harassment to Norrell.

### The Relationship between the Parties

On August 10, 1995, two days after reporting her sexual harassment complaint, Hylton submitted an employment application to a competing employment agency, TemPositions. In a little more than a week after the reporting incident, Hylton worked for Norrell on 22 of the next 29 calendar days (August 16 to September 13). Sixteen of the 22 days worked involved the desirable shifts of 10 hours or more. During that period, one of the patients to whom Hylton was assigned died, thus ending her assignment.

On September 18, 1995, Hylton filed for unemployment insurance benefits. On September 20, 1995, Hylton submitted an employment application to Health Force and took a required physical the next day. On September 23, 1995, Hylton began employment for a temporary employment agency in New Jersey. Norrell called Hylton on September 27, 1995, to offer her an assignment, but Hylton rejected the offer.

On October 5, 1995, Hylton went for in-service training with her former employer, Health Force. A services coordinator from Norrell called Hylton on October 9, 1995 to offer her another assignment which Hylton rejected and instead went to an orientation session for Health Force. On October 12, 1995, Hylton accepted an assignment from Norrell and worked a 16 hour shift until the patient died the next day.

On October 16, 1995, Hylton commenced full-time employment (Monday to Friday) at a group home for TemPositions. At the same time, she accepted Saturday and Sunday assignments from Norrell for the weekend of October 21 and 22. Norrell offered her an assignment for October 23, 1995 but Hylton rejected that offer because it conflicted with her TemPositions employment. Norrell service coordinators finally stopped calling Hylton to offer her assignments because they believed due to the high frequency of rejected assignments Hylton was no longer interested in working for Norrell.

A "time-line" summary of Hylton's employment activities from August 8, 1995 to October 23, 1995, is as follows:

| | |
|---|---|
| August 8, 1995 | Plaintiff scheduled to work, calls off, reports incident. |
| August 10, 1995 | Plaintiff submits employment application with TemPositions. |
| August 16, 1995 | Plaintiff works her first shift with Norrell after the incident (4 hrs.). |

| Date | Event |
|---|---|
| August 17, 1995 | Plaintiff works a 4 hr. shift for Norrell. |
| August 18, 1995 | Plaintiff works a 4 hr. shift for Norrell. |
| August 21, 1995 | Plaintiff works a 10 hr. shift for Norrell. |
| August 23, 1995 | Plaintiff works a 10 hr. shift for Norrell. |
| August 24, 1995 | Plaintiff works a 10 hr. shift for Norrell. |
| August 25, 1995 | Plaintiff works a 10 hr. shift for Norrell. |
| August 28, 1995 | Plaintiff works a 4 hr. shift for Norrell. |
| August 29, 1995 | Plaintiff works a 4 hr. shift for Norrell. |
| August 30, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| August 31, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 1, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 2, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 3, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 4, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 7, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 8, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 9, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 10, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 11, 1995 | Plaintiff works a 12 hr. shift for Norrell. |
| September 13, 1995 | Plaintiff works a 4 hr. shift for Norrell. |
| September 18, 1995 | Plaintiff files for unemployment insurance. |
| September 20, 1995 | Plaintiff submits employment application with Health Force. |
| September 23, 1995 | Plaintiff works for agency in New Jersey. |
| September 24, 1995 | Plaintiff works for agency in New Jersey. |
| September 27, 1995 | Plaintiff rejects assignment from Norrell. |
| October 1, 1995 | Plaintiff works for agency in New Jersey. |
| October 5, 1995 | Plaintiff attends in-service training at Health Force. |
| October 7, 1995 | Plaintiff works for agency in New Jersey. |
| October 8, 1995 | Plaintiff works for agency in New Jersey. |
| October 9, 1995 | Plaintiff rejects assignment from Norrell. |
| October 10, 1995 | Attends orientation with Health Force. |
| October 12, 1995 | Plaintiff works 16 hr. shift for Norrell. |
| October 16, 1995 | Plaintiff works full time for Tem-Positions. |
| October 20, 1995 | Plaintiff works full time for Tem-Positions. |
| October 21, 1995 | Plaintiff works for Norrell. |
| October 22, 1995 | Plaintiff works for Norrell. |
| October 23, 1995 | Plaintiff rejects work from Norrell in favor of full-time work with TemPositions. |

Norrell's business decreased approximately 18% from the week of Hylton's complaint until the end of 1995. Hylton was never told she did not receive assignments because of her sexual harassment complaint, and one of the service coordinators with whom she worked did not know about her sexual harassment complaint until she tried to give Hylton an assignment on October 9, 1995. That coordinator stopped calling Hylton because she turned away so many assignments. Hylton rejected three assignments from Norrell from September 27, 1995 to October 23, 1995, in part because her assignments from Norrell conflicted with her other temporary and full-time work.

Under Norrell's computer employee roster procedure, an employee who is currently working or has worked in the last 90 days is considered "active." However, an employee is placed on the "terminated" roster if he or she has not worked within ninety days or is not in compliance with a regulatory requirement or company policy. Being placed in the "terminated" category only means that the person is removed or "terminated" from the computer system. Terminated, with respect to the employee roster, does not mean that the employee was discharged or fired from employment by Norrell. A person on the terminated list can be placed on the active list simply by updating his or her file with the compliance department or recommencing work with Norrell.

In June 1996, Norrell received a job status request and authorization relating to Hylton. Norrell's payroll coordinator, Laurie Sittinger ("Sittinger"), responded to this request. It was her duty to purge Norrell's computer roster of employees on a periodic basis to remove inactive or ineli-

gible employees and "terminate" them from the system if they failed to meet regulatory or company standards. In checking with the compliance officer in her office, Sittinger was informed that Hylton's personnel file was no longer in compliance with state regulations (*e.g.*, she did not have the necessary medical clearance, in-service training certificates, etc.).

Sittinger responded to the job status inquiry by stating that Hylton's file was "out of compliance, as per NYS Dep't. of Health regulations. Ms. Hylton was terminated for this reason." Sittinger had no knowledge of Hylton's sexual harassment complaint when she wrote this letter.

According to Hylton she did not receive her W–2 forms for 1995. W–2 forms for Norrell employees nationwide are prepared and mailed out of Norrell's distribution center in Plainview, New York, based only on payroll information contained in Norrell's computerized payroll records. Hylton has no knowledge as to how W–2 forms are prepared at Norrell or as to who mails W–2 forms.

## *Discussion*

### I. *Summary Judgment is Appropriate*
### A. *Standard for Summary Judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue of material fact, and the facts as to which there is no such issue, warrant judgment for the moving party as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The use of the summary judgment procedure is encouraged to resolve legal issues and to resolve actions where the material facts are undisputed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Moreover, "[a]lthough ... summary judgment may be inappropriate in some sexual harassment cases where questions persist as to whether the conduct at issue amounts to sexual harassment," summary judgment under Rule 56 is still fully appropriate, indeed, mandated, when the evidence is insufficient to support the non-moving party's case. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998) (internal quotation and citation omitted). If after accepting the truth of Hylton's allegations she cannot satisfy the legal standard for proving her claim, summary judgment is appropriate to dispose of a sexual harassment claim under Title VII. *See, e.g., Ricard v. Kraft General Foods Inc.*, 1993 WL 385129 *3 (S.D.N.Y. March 16, 1993) (granting summary judgment to employer on hostile environment claim involving allegations of four sexually-oriented incidents), *aff'd mem.*, 17 F.3d 1426 (2d Cir.1994).

### B. *The Sexual Harassment Suffered by Hylton Was Not Caused by Norrell*

Hylton was sexually harassed not by a Norrell employee but by the son of a patient who had retained the VNS. Norrell had a contractual obligation to care for the patient and not to abandon her, at least not without permission of its customer, VNS. Here, Norrell neither abandoned the patient, nor forced Hylton to return to the Alfieri home after her complaint, acceded to Hylton's demand not to return to the Alfieri home, and assigned another HHA instead for the last day of the assignment. Norrell did what it was obligated to do under its subcontract with VNS and what was reasonable under the circumstances, namely to immediately report to VNS the incident reported by Hylton. As a consequence, a VNS nurse visited the Alfieri home that day to investigate the matter.

■ Generalized fears such as "I was afraid of repercussions" related to informing an employer of harassment in the workplace do not constitute reasonable grounds for an employee's failure to raise a complaint of harassment with his or her employer. *See Fierro v. Saks Fifth Ave-*

*nue,* 13 F.Supp.2d 481, 492 (S.D.N.Y.1998). In *Fierro,* plaintiff had an opportunity to lodge a hostile work environment claim, but failed to do so. Despite being fully aware of Saks' complaint procedures, he never complained to anyone due to his own belief that management would not look favorably upon a person who filed such complaints. In granting summary judgment to defendant, the court in *Fierro* held that such assertions do not create genuine issues of material fact. *Id.* at 493. The court concluded:

> At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment. Without such a requirement, it is difficult to see how Title VII's deterrent purposes are to be served, or how employers can possibly avoid liability in Title VII cases. Put simply, an employer cannot combat harassment of which it is unaware.

*Id.* at 492.

■ Hylton suffered no job loss as the result of her complaint of harassment. Hylton worked 22 out of 29 calendar days soon after filing her complaint. Any fear of retaliation was not reasonable nor justified. *See Montero v. AGCO Corp.,* 19 F.Supp.2d 1143, 1146 (E.D.Cal.1998) (employer's prompt, remedial action supports dismissal of plaintiff's claim that her fear of retaliation prevented her from raising harassment complaint.)

Moreover, the record in this case is devoid of any evidence that Norrell helped create the hostile environment within which Hylton found herself on August 7, 1995. It should be noted that Hylton had worked in the Alfieri home for five months without complaint and Norrell had investigated the August 4 complaint of another HHA and specifically inquired of Hylton as to any problem. This is not a case where Norrell, through its actions, knowingly put Hylton at risk as in *EEOC v. Sage Realty Corp.,* 507 F.Supp. 599 (S.D.N.Y.1981), where the plaintiff, a female building lobby attendant, was required to wear a reveal-

ing and sexually provocative outfit and was subject to sexual harassment by a cleaning contractor. The one prior report was insufficient to establish contributory behavior on the Part of Norrell, particularly in view of Hylton's response to the inquiry made.

Our Circuit has held that a university could not be held liable for the sexually harassing behavior of a non-employee dental patient, *see Murray v. New York University College of Dentistry,* 57 F.3d 243 (2d Cir.1995), even though the university was on notice both from the victim and from the victim's colleague that she was subject to harassment by the patient. The Second Circuit upheld the district court's finding that the university's response was reasonably calculated to end the harassment despite the severe and pervasive atmosphere of harassment to which plaintiff was subjected.

Here, Norrell responded with dispatch and promptly remedied the situation. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (employer's reprimand of the harasser four days after the incident constituted prompt remedial action and thereby precluded liability for hostile environment sexual harassment.) Norrell's response was prompt, reasonable and effective.

### C. Retaliation Has Not Been Established

According to Hylton, she was retaliated against for raising her sexual harassment claim in three different ways as alleged in the complaint. First, she alleges that she did not receive "regular" work after the incident at the Alfieri home. Second, she claims that she did not receive her W–2 form for 1995. Third, she contends that she was "refuse[d] work reference" and that the reference indicated that she was "fire[d]" from her job.

■ To establish a *prima facie* case of retaliation under Title VII, Hylton must establish that (1) Norrell took "adverse action" against her after becoming aware of her protected activity, and (2) there is a

causal connection between the protected activity and the adverse action. *See Murray,* 57 F.3d at 251; *see also, Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995) (to establish prima facie case, plaintiff must show an employment action "disadvantaging" the plaintiff.) Here, there is no direct evidence of retaliation and Hylton has not supported her claims through circumstantial evidence.

 Hylton contends that she was not given "regular" work yet, as amply demonstrated above, she received a substantial number of assignments—22 in 29 calendar days—until she began to reject work from Norrell in favor of work from competitors. Hylton was an employee of a temporary employment agency. During the period following Hylton's report, Norrell's business, which depended on the frequency of assignments received from customers, decreased dramatically. No evidence has been presented that there were assignments received by Norrell that did not go to Hylton. Within eight days of her complaint, she worked more than five days a week for the next four weeks and turned away work Norrell had for her because it conflicted with her work with competing agencies.

No evidence has been presented as to how Hylton was disadvantaged by not receiving a W–2 form or a job reference that was accurate and in any event did not preclude her from attending the school she was seeking to attend by soliciting the reference. Assuming these to be adverse actions, they are at best *de minimis* and insufficient to support a finding of a cognizable adverse employment action. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462 (2d Cir.1997) (loss of phone and office not sufficiently deleterious to constitute adverse employment action).

Hylton has not shown that her failure to receive her W–2 form had any connection with her sexual harassment claim. The W–2 forms at Norrell are generated at a separate location based on information contained in Norrell's computerized payroll records with no human involvement for all intents and purposes. Similarly, the job reference was given by a payroll coordinator who provided accurate information, namely, that Hylton had been "terminated" from its system eight months after her last day of employment. The payroll coordinator had no knowledge of Hylton's sexual harassment complaint when she provided the job status letter in question.

 Even if it is assumed that Hylton has established a *prima facie* case, Norrell has offered legitimate, business-related reasons for its actions. Norrell gave "regular" work to Hylton after her sexual harassment complaint, when that work was available in the face of a business downturn. That "regular" work only ceased when Hylton rejected work from Norrell. There is no evidence in the record to suggest that the reasons offered by Norrell for not offering work to Hylton after October 23, 1995 are pretextual. *See Murray,* 57 F.3d at 251 (no retaliation where plaintiff failed to show inconsistent application of standards); *Rose v. Greene,* 1998 U.S.App. LEXIS 12941, 1998 WL 386200 (2d Cir.1998) (retaliation claim rejected where causal link between purported adverse action and filing of EEOC charge absent).

### Conclusion

Upon the foregoing facts and conclusions, the motion for summary judgment dismissing the complaint is granted. Settle judgment on notice.

It is so ordered.