**Ann K. DUNBAR, Plaintiff,**

v.

**THE COUNTY OF SARATOGA, the Saratoga County Sheriff's Department, and James D. Bowen, individually and in his official capacity, Defendants.**

**No. 1:99–CV–79(HGM/RFT).**

United States District Court, N.D. New York.

March 3, 2005.

Deily, Mooney & Glasetter, LLP, Albany, NY (Lisa F. Joslin, of counsel), for plaintiff.

Girvin & Ferlazzo, P.C., Albany, NY (Jacinda N. Hall, of Counsel), for defendant.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Senior District Judge.

Currently before the court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss plaintiff's amended complaint in its entirety. *See* Dkt. No. 57, Defs.' Mem. of Law in Supp. Plaintiff opposes defendants' motion. *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp'n. For the reasons that follow below, the court GRANTS defendants' motion in part and DENIES their motion in part.

## BACKGROUND

### I. The Parties and the Procedural History

Between March 15, 1996, and June 12, 1997, plaintiff, Ann K. Dunbar ("Dunbar" or plaintiff), was actively employed as a corrections officer ("CO") in the Saratoga County Sheriff's Department ("Sheriff's Department"). *See* Dkt. No. 29, Am. Compl. at ¶ 5. Defendant, County of Saratoga ("County"), was and continues to be duly organized and existing as a county by virtue of the laws of the State of New York. *See Id.* at 6. Defendant, James D. Bowen ("Bowen"), was appointed as Sheriff for the County in 1972. *See* Dkt. No. 3, Answer at ¶ 7. As Sheriff, Bowen possessed certain authority to implement and enforce certain policies of the County. *See Id.* at ¶ 7. Plaintiff filed her complaint against defendants on January 19, 1999, alleging violations of Title VII of the 1964 Civil Rights Act, The New York State Human Rights Law ("NYHRL"), and 42 U.S.C. § 1983. *See* Dkt. No. 1, Compl. Additionally, plaintiff filed an amended complaint on December 29, 1999, in which she added allegations based on sex discrimination in the terms and conditions of her employment, and added allegations concerning Bowen's capacity as an arbiter of final policy. *See* Dkt. No. 29, Am. Compl. The case was originally before the Honorable Lawrence E. Kahn, but was transferred to this court. Dkt. No. 66.

### II. Facts

On March 15, 1996, the Sheriff's Department hired plaintiff and assigned her to work at the County's correctional facility guarding inmates where she remained actively employed until June 12, 1997. *See* Dkt. No. 61, Dunbar Aff. at ¶ 2; Dkt. No. 60, at 2. Plaintiff alleges that soon after beginning her employment with the County, some of her co-workers made unwelcomed sexual advances, and directed graphic sexual comments and jokes, and obscene and offensive gestures toward her. *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 2. Plaintiff alleges that her co-workers and supervisors regularly used obscene language and viewed sexually explicit material including pornographic magazines in the workplace. *See Id.* Plaintiff alleges that CO William Cottrell ("Cottrell") made sexual advances towards her, made sexually explicit remarks and jokes in her presence, commented on her breasts and buttocks, attempted to engage her in sexual

conversation, left sexual notes on her car, and called her on several occasions. *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 2. Additionally, plaintiff alleges that CO Stan Dake ("Dake") propositioned her to go on a vacation and that CO Patrick Dunn ("Dunn") directed sexual questions and remarks toward her while viewing sexually explicit material.[1] *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 2–3.

During the summer of 1996, plaintiff claims that she informed Bowen of her intention to apply for a civil service position because she was distressed by the working environment in the correctional facility. *See Id.* at 3. Plaintiff contends that Bowen did not take any action or direct her to the County's sexual harassment complaint procedure. *See Id.* Bowen recalls no such meeting ever taking place. *See* Dkt. No. 58, Bowen Aff. at ¶ 19.

Plaintiff also contends that she was subjected to discrimination on the basis of her sex in the terms and conditions of her employment. See Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 5. Plaintiff contends that she was denied certain job assignments, training opportunities, and was routinely required to guard more inmates than similarly situated male correctional officers. *See Id.* at 5. Defendants deny that plaintiff was subjected to discrimination on the basis of sex in the terms and conditions of her employment because they never subjected her to any adverse employment action nor denied her any tangible job benefits. *See* Dkt. No. 57, Def.'s Mem of Law in Supp. at 3.

On April 10, 1997, plaintiff attended the County's mandatory sexual harassment training, and at the training plaintiff completed a sign-in sheet requiring her name, social security number, and initials. Dkt. No. 56, Def.'s Statement of Material Facts at ¶¶ 2–3. During this training, Plaintiff heard a presentation on the County's sexual harassment complaint procedure and was provided a copy of the County's 1997 Sexual Harassment Policy. *See Id.* at ¶ 4. The County's 1997 Sexual Harassment Policy (the "Policy") states in part: "[c]omplaints should be presented orally or in writing to (1) supervisory personnel, (2) Department Heads and (3) the Personnel Director, in successive order." *See Id.* ¶ 6. Plaintiff did not ask any questions at train-

---

1. As contained in her Equal Employment Opportunity Commission ("EEOC") Charge of harassment, plaintiff alleges that "Cottrell ... was particularly offensive on a regular basis. [He] constantly spoke [to plaintiff] about how much he loved women and how good he was at pleasing them. Other corrections officers overhearing these comments would laugh and call him a 'slut.'" Dkt. 58, Ex. B. "On more than one occasion, ... Cottrell offered to give [plaintiff] a 'rub down[,]' ... repeatedly tried to engage [plaintiff] in conversations about sex and said, 'I picture you as being a wild woman in bed.'" *Id.* "Cottrell asked [plaintiff], 'Why do women put such a great emphasis on breast-size? ... I don't care if you were born without boobs, you have a nice ass.'" *Id.* "On several occasions, ... Cottrell told [plaintiff] that he had dreams about [her],and that he 'woke up sweating with a big hard on.'" *Id.* "Officer Cottrell asked [plaintiff] on a regular basis to accompany him to his boat to have sex ... Cottrell also repeatedly left notes on [plaintiff's] car propositioning sex." *Id.* "On many occasions, ... Cottrell commented on his underwear, and said to [plaintiff] that his 'little guy never stayed put, and always needed to be adjusted.'" *Id.* "Dunn bragged to other officers in [plaintiff's] presence that he was fully capable of pleasing himself sexually. He then yelled to [plaintiff], 'There's nothing my wife can do that Rosey Palm can't do, and you can tell her that." *Id.* "On many occasions, ... Dunn came up to the watch tower with a *Playboy* magazine in his hand commenting about 'tits and pussy,' and would ask [plaintiff] what she thought of various pictures." *Id.* "In January of 1997, [plaintiff] asked some of [her] co-workers if she could take the first week in June off for a vacation.... Dake answered, 'step in the back room with me, we'll shut the door, and then maybe I'll give you the week." *Id.*

ing and does not dispute that she fully understood the Policy. *Id.* at ¶ 5. Plaintiff maintains that during the training, however, her co-workers laughed, joked and mocked the presentation's content. Dkt. No. 61, Dunbar Aff. at ¶¶ 38–39; *Id.* Ex. E at 84; *Id.* Ex. G at 50. During plaintiff's employment at the County's correctional facility, she never filed a complaint with any County employee, department head, or personnel director. *See* Dkt. No. 56, Def.'s Statement of Material Facts at ¶¶ 7–8. Plaintiff never asked any supervisory personnel at the Sheriff's Department to change the shift(s) she worked, nor did she request a reassignment, nor did she request computer training. *Id.* at ¶¶ 11–13. Plaintiff never asked a supervisor to be assigned to "outside detail," nor did she ask to be assigned to the "A–Pod" rather than the "B–Pod" areas of the correctional facility and was in fact assigned to each pod. *Id.* at 20–22. Plaintiff never asked to be assigned to the booking area. *Id.* at 23. During plaintiff's employment at the County's correctional facility, Bowen never harassed her, nor did he criticize her job performance. *Id.* at ¶ 29. Bowen never refused to meet with plaintiff and treated her in a courteous and polite manner. Dkt. No. 56, Def.'s Statement of Material Facts at ¶¶ 31–32. Beyond generally referencing the degrading conduct of her co-workers, plaintiff never identified, by name or otherwise, those who allegedly harassed her. Dkt. No. 59, Pl.'s Statement. of Material Facts at ¶¶ 41–42. Plaintiff never repeated or described to Bowen: (1) a single vulgar or offensive comment allegedly uttered by her co-workers; (2) a single sexual gesture allegedly directed at her by her co-workers; (3) any obscene materials allegedly shown to her by her co-workers; or (4) a single sexual advance allegedly made by her co-workers. Dkt. No. 56, Def.'s Statement of Material Facts at ¶¶ 43–46. All

told, plaintiff never described a specific instance of sexual harassment to Bowen, and he was never present when COs Cottrell, Dake or Dunn allegedly directed harassing or discriminatory remarks at plaintiff. *Id.* at 47–48.

While plaintiff does not dispute that she never filed or lodged a complaint in accordance with the Policy, she contends that she informed Lieutenant Rooney ("Rooney") and Sergeant Doherty ("Doherty") that she was subjected to sexual harassment when they interviewed her regarding an unrelated allegation of sexual harassment. Dkt. No. 59, Pl.'s Statement. of Material Facts at ¶ 8. Plaintiff explained in detail to Rooney and Doherty the circumstances surrounding her alleged harassment at the correctional facility, and she told them that she planned on investigating other employment opportunities because she could no longer endure the harassment. *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 4; Dkt. 61, Dunbar Aff. at ¶¶ 28–29. Plaintiff contends that she was discouraged from pursuing her complaint because in reply to her concerns, Rooney stated in words to the effect that, "I can't guarantee that it would be without negative consequence to you." *See* Dkt. No. 59, Pl.'s Stat. of Mat. Facts. at ¶ 14. While admitting that she failed to give the names of those who harassed her, plaintiff attributes her failure to the potential retaliation she feared in light of Rooney's comment. *See* Dkt. No. 60, Pl.'s Mem. of Law in Opp. at 4. The County denies that Rooney made such a statement, and contends that if plaintiff had given Rooney the names of those individuals who allegedly harassed her or the date and time the harassment occurred that the complaint would have been fully investigated. *See* Dkt. No. 57, Def.'s Mem of Law in Supp. at 19–20; *see also* Dkt. No. 59, Pl.'s Statement of Material Facts at ¶ 64.

On June 12, 1997, plaintiff began a disability leave from employment with the Sheriff's Department as a result of injuries she sustained in an off-duty automobile accident. Plaintiff concedes that apart from working a single shift sometime between June 12 and August 21, 1997, the date she hand-delivered her letter of resignation, she did not visit, nor was she otherwise present at, the correctional facility.[2] Dkt. No. 59, Pl.'s Statement. of Material Facts at ¶¶ 69–70; Dkt. No. 58; Ex. D at 76. Plaintiff does not dispute that as of August 21, 1997, she was not aware of any complaints of sexual harassment at the correctional facility other than one Rooney and Doherty had investigated. Dkt. No. 59, Pl.'s Statement. of Material Facts at ¶ 76. Plaintiff does not dispute that she conducted a job search and obtained new employment prior to submitting her letter of resignation. *Id.* at ¶ 77.

On March 5, 1998, plaintiff verified her Charge of Discrimination, as prepared by her attorneys, with the EEOC. *See* Dkt. No. 56, Def.'s Stat. of Mat. Facts at ¶ 74. The EEOC, on October 24, 1998, notified plaintiff of her right to file a civil action against the defendants under Title VII of the Civil Rights Act of 1964. Dkt. No. 29, Am. Compl. at ¶ 4. The plaintiff included nine causes of action in her amended complaint:

(1) County of Saratoga has discriminated against the plaintiff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) County of Saratoga has discriminated against plaintiff on basis of her sex in violation of New York Executive Law § 296(1)(a); (3) The Sheriff's Department has discriminated against the plaintiff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (4) The Sheriff's Department has discriminated against plaintiff on the basis of her sex in violation of New York Executive Law § 296(1)(a); (5) James Bowen has violated New York Executive Law § 296(6); (6) Saratoga County has recklessly or deliberately deprived plaintiff of her right to equal protection under the law guaranteed by the Fourteenth Amendment, and therefore, is liable under 42 U.S.C. § 1983; (7) The Sheriff's Department has recklessly or deliberately deprived plaintiff of her right to equal protection under the law guaranteed by the Fourteenth Amendment, and therefore, is liable under 42 U.S.C. § 1983; (8) James Bowen has recklessly or deliberately deprived plaintiff of her right to equal protection under the law guaranteed by the Fourteenth Amendment, and therefore, is liable under 42 U.S.C. § 1983; (9) Due to the above mentioned violations under 42 U.S.C. 2000e and 42 U.S.C. § 1983, the plaintiff claims that she is entitled to attorneys' fees and expenses from defendants pursuant to 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988(b).

Dkt. No. 29, Am. Compl. at ¶¶ 25–54. Defendants have moved for summary judgment in all parts. *See* Dkt. No. 57, Defs.' Mem. of Law in Supp.

## DISCUSSION

### I. Summary Judgment Standard

The standard for summary judgment is well-settled. Rule 56 allows for summary

---

**2.** Plaintiff tendered the following letter of resignation: "Dear Sheriff Bowen: I respectfully resign my position of correction officer with your department. My last day of service will be Wednesday September 03, 1997. I would like to thank you for giving me the opportunity to have served under you. The experience I have gained here will be an asset to me as I further advance my career opportunities. Sincerely, Ann K. Dunbar." Dkt. No. 58, Ex. K.

judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure a just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). A court may grant a motion for summary judgment when the moving party carries its burden of showing that no triable issues of fact exist. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See Id.; United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P 56(e). To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See Anderson*, 477 U.S. at 250–251, 106 S.Ct. at 2511.

## II. Plaintiff's Hostile Work Environment and NYHRL Claims [3]

### A. Hostile Work Environment

■ Title VII provides, in relevant part, that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII encompasses the entire spectrum of "disparate treatment ..., which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). A claim for hostile work environment sexual harassment is established under Title VII, when an individual's "workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

**3.** New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII; therefore, claims under the NYHRL and under Title VII are essentially identical. *See Tomka v. Seiler*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995) (citing *Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489

N.E.2d 745 (1985)); *see also Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under NYHRL "is governed by the same standards as his federal claim"). By examining the applicable standard for Title VII claims, the court addresses plaintiff's NYHRL claims.

abusive work environment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (internal citation and quotations omitted).

Determining whether the workplace is permeated with discriminatory intimidation that is severe or pervasive so as to alter the conditions of the victim's employment requires an evaluation of all the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id.*, 510 U.S. at 23, 114 S.Ct. at 371. It is important to note, however, that Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir.2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive." *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989); *Tomka*, 66 F.3d at 1305 n. 5 (citations omitted) ("[T]he incidents must occur in concert or with a regularity that can reasonably be termed pervasive."); *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."). Additionally, the employee must subjectively perceive the environment to be hostile, and the environment must be one that a reasonable person would find hostile or abusive. *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir.1997).

Here, defendants, while not expressly conceding the issue, mount only a small effort to contest the allegations of sexual harassment regarding it as an issue genuinely in dispute and instead devote their focus to the issue of their liability. *See* Dkt. No. 57, Defs.' Mem. of Law at 15–22; Dkt. No. 62, Defs.' Reply Mem. of Law at 9 and 13 ("Plaintiff curiously devotes three pages of her Memorandum discussing her co-workers' alleged offensive conduct, (citation omitted) which *is not* the subject of Defendant's [sic] pending motion.") (emphasis added). Examining the evidence in the light most favorable to plaintiff, the court cannot say, as a matter of law, that no reasonable jury would find that a hostile work environment existed. The instances of harassment articulated by plaintiff in her EEOC charge are more than single, isolated examples of verbal abuse. Not only did plaintiff allege eight specific incidents with decidedly sexual overtones over the course of her fifteen months of active employment with the County, but she also asserted that certain harassment she detailed occurred, "[o]n more than one occasion," "[o]n several occasions," "on a regular basis," "on many occasions," and on a daily basis. Dkt. No. 58, Ex. B; Dkt. No. 60, Pl.'s Mem. of Law at 2. While the alleged offensive language and sexual gestures were not accompanied by any allegations of physical harm, a plaintiff need not endure threats of physical harm to sustain a hostile work environment claim. *See Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 440 (2d Cir.1999). Although a close issue, in view of all the circumstances, the court finds that plaintiff's hostile work environment claims are sufficient to withstand summary judgment. Were a reasonable jury to credit plaintiff's version of the case, it could find that Cottrell's, Dake's and Dunn's conduct, taken together, crossed the admittedly indistinct line between "boorish and inappropriate" be-

havior and actionable sexual harassment. *Holtz v. Rockefeller & Co., Inc.* 258 F.3d 62 (2d Cir.2001). *Compare Alfano,* 294 F.3d at 378–380 (collecting cases and finding that five incidents, three of which amounted to different iterations of a single sexual prank, over a four-year period, were too few, too separate in time and too mild to sustain a hostile work environment claim) *and Quinn,* 159 F.3d at 768 (finding an appreciative comment about plaintiff's buttocks and a deliberate touching of her breasts insufficient as a matter of law to alter the terms and conditions of employment) *with Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir.2001) (finding a triable issue where plaintiff demonstrated that in two and a half years, she was subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage and one serious threat of physical harm); *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997) (holding that the plaintiff had created a triable issue based on ten to twelve instances of explicitly racist conduct in twenty months, where most of the incidents involved racial jokes and epithets that insulted blacks, Puerto Ricans, and people of Middle Eastern origin); *and Holtz,* 258 F.3d at 75–76 (finding a triable issue where during more than one year of employment, plaintiff's harasser touched plaintiff's hand on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life).

### B. Employer Liability/Co-worker Harassment

██ After establishing that a hostile work environment exists, a plaintiff must also demonstrate a specific basis to impute liability for harassment to the employer in question. *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 63 (2d Cir.1998). Where, as here, co-employees-as distinct from a supervisor-are "alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.' " [4] *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) (citing *Tomka,* 66 F.3d at 1305); *Murray v. New York University College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). Under Title VII, an employer's actual knowledge of the harassment is not required. *Distasio,* 157 F.3d at 63. Instead, "an employer is considered to have notice of sexual harassment if the employer or any of its agents or supervisory employees knew or should have known of the conduct." *Id.* (citing *Murray,* 57 F.3d at 249).

██ Here, the court finds that defendants provided a reasonable avenue of complaint to which plaintiff did not avail herself. The court also finds that defendants did not know of the harassment. The County had two written policies prohibiting sexual harassment while plaintiff was employed at the correctional facility: one covered 1996 and the other covered 1997-the years in which the County employed plaintiff. Dkt. No. 58, Exs. F and G. It is undisputed that the Sheriff's Department provided, and plaintiff attended, mandatory sexual harassment training on April 10, 1997, and that plaintiff received a copy of the County's 1997 Policy. Plaintiff never filed a complaint in accordance with the County's Policy, which states in pertinent part: "Complaints should be presented orally or in writing to (1) supervisory

---

**4.** Plaintiff does not allege that her immediate supervisors or Bowen sexually harassed her; therefore, the court need not address strict liability for supervisory sexual harassment as to defendants.

personnel, (2) Department Heads and (3) the Personnel Director, in successive order." *See* Dkt. No. 56, Def.'s Stat. of Mat. Facts at ¶ 6. Plaintiff never filed a complaint in writing, nor did she orally submit her allegations of sexual harassment to her supervisor, Department Head and Personnel Director; notably, plaintiff never filed any type of complaint relating to the alleged sexual harassment with Bowen. Plaintiff contends that she made oral complaints regarding her own alleged sexual harassment to Rooney and Doherty when they interviewed her regarding an unrelated charge of sexual harassment, but there is nothing in the record to suggest that they were supervisory personnel, department heads, or the personnel director. *See* Dkt. No. 59, Pl.'s Stat. of Mat. Facts at ¶ 8.

In relating her own alleged sexual harassment, plaintiff failed to identify those who harassed her because she feared retaliation. *See Id.* at ¶ 61. Though there is considerable disagreement as to Rooney's immediate response, plaintiff contends that Rooney replied in words to the effect that he "could not guarantee that [identifying those who allegedly harassed her] would be without negative consequence." Dkt. No. 60, Pl.'s Mem of Law at 4. Even assuming *arguendo* that Rooney made a statement of that sort, it does not substantiate plaintiff's speculations. In fact, plaintiff was not aware of any complaints of sexual harassment while ac-

tively employed at the correctional facility with the lone exception of the anonymous complaint that was investigated by Rooney and Doherty. Not surprisingly then, plaintiff fails to cite a single correctional facility employee who was subjected to retaliation for making a complaint. Moreover, the parties agree that Rooney told plaintiff that if she made a complaint, it would be investigated and appropriate action would be taken against any person found to have violated the Policy. Dkt. No. 59, Pl.'s Statement of Material Facts at ¶ 64. Thus, plaintiff's unspecified fear of retaliation is insufficient to rebut defendants' reasonable avenue of complaint: "[a]s a matter of law, ... such generalized fears can never constitute reasonable grounds for an employee's failure to complain to his or her employer." *Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 492 (S.D.N.Y.1998).[5] Moreover, the fact that Rooney and Doherty were conducting an investigation into allegations of sexual harassment should have notified plaintiff that a properly filed complaint would be investigated. Plaintiff failed to take advantage of defendants' reasonable avenue of complaint.

The court also finds that defendants knew of the alleged harassment. "The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles." *Id.* (citing *Torres*, 116 F.3d at 636–37). An official's knowledge will be

---

**5.** The analogous rule with respect to supervisory sexual harassment is illustrative as to the issue the court confronts here: "Title VII plaintiffs must at least make reasonable efforts to seek redress for any perceived harassment through the employer before initiating a lawsuit in federal court ... At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment." *Fierro*, 13 F.Supp.2d at 492. "That an employee failed to ... use any complaint procedure provided by the em-

ployer ... will normally suffice to satisfy the employer's burden" that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellereth*, 524 U.S. 742, 765 118 S.Ct. 2257, 2270 141 L.Ed.2d 633 (1998); *see also Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295–96 (2d Cir.1999).

imputed to his employer when: (1) the official is at a sufficiently high level within the organization's management hierarchy to qualify as a proxy for the company; (2) the official is charged with a duty to act on the knowledge and stop the harassment; or (3) the official is charged with a duty to inform the company of the harassment. *Distasio*, 157 F.3d at 63.

Plaintiff suggests that Bowen had knowledge of the alleged sexual harassment or gender discrimination because she had met with him and revealed her plan to take the Civil Service exam. She also expressed that she was not "happy" in her position and that she "didn't like the way people treated one another, the way they talked to one another, [and] the disrespect that was shown in front of inmates from one officer to another." Dkt. No. 58, Ex. D at 137, 139. She failed, however, to describe any specific incidents of harassment. *Id.* at 140. Such generalized remarks were insufficient to impute to Bowen, an official clearly at a high level within the organization management hierarchy to qualify as a proxy for the company, knowledge of alleged sexual harassment. The court credits defendants argument that both male and female employees may feel unhappy, underappreciated and even disrespected at times for reasons unrelated to sexual harassment or gender discrimination.

Plaintiff's complaint to Rooney and Doherty as described above, however, is sufficient to notify defendants of the alleged sexual harassment. While there is no evidence to suggest that Rooney or Doherty were high-ranking officials within the Sheriff's Department, they were apparently charged with investigating harassment, as evidenced by their investigation of the anonymous complaint of sexual harassment. Although defendants contest the exact exchange between plaintiff and Roo-

ney and Doherty, plaintiff maintains that she described to them in detail the alleged instances of sexual harassment. Here, the court is confronted with questions of fact that cannot be resolved through summary judgment. Although the court is sympathetic to the fact that Rooney and Doherty had no "leads" to follow if they were to pursue an investigation, *see* Dkt. No. 61, Ex. M, Doherty Dep. at 82–83, considering the evidence in the light most favorable to plaintiff, Rooney and Doherty, as agents of the Sheriff's Department and the County, had constructive, if not actual, knowledge of the alleged harassment. Accordingly, defendants' motion for summary judgment dismissing plaintiff's hostile work environment and NYHRL claims is denied.

### III. Plaintiff's Claims of Constructive Discharge and Disparate Treatment

#### A. Failure to Exhaust Administrative Remedies

In her charge to the EEOC filed March 5, 1998, plaintiff failed to include allegations of either constructive discharge or disparate treatment. Defendants argue that plaintiff failed to administratively exhaust those claims and that the court lacks jurisdiction to hear such claims. Dkt. No. 57, Defs.' Mem. of Law at 4. Plaintiff contends that the matter is settled under the "law-of-the-case" doctrine in that the court previously granted her leave to file an Amended Complaint with regard to her claims for constructive discharge and disparate treatment. Dkt. No. 60, Pl's Mem. of Law at 18. Plaintiff acknowledges that the court did not expressly rule on the issue, but argues that in granting her leave to amend her complaint, the court necessarily decided the issue. Under the doctrine of law-of-the-case, once a court has decided a rule of law, that decision should continue to govern the same issues

through subsequent stages of the same case. "Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 2177–78, 100 L.Ed.2d 811 (1988) ("The doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions."). Under the doctrine "courts are understandably reluctant to reopen a ruling once made ... [r]eluctance, however, does not equal lack of authority. The [doctrine's] constraint is a matter of discretion." 18B Charles A. Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure § 4478 at 637 (2d ed.2002). In the Second Circuit, "[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (internal quotation omitted).

In its prior opinion, the court did not expressly rule on the jurisdictional issue, and a careful reading of the court's prior analysis offers little from which one could infer that it considered the issue in rendering its decision. In other words, it is not clear that plaintiff's constructive discharge and disparate treatment claims are truly settled under the "law-of-the-case" doctrine. To the extent that they are, however, the court opts to reconsider the matter.

■■■ "A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge." *Butts v. City of New York,* 990 F.2d 1397, 1401 (2d Cir.1993) (internal quotation omitted). Courts "generally have no jurisdiction to hear claims not alleged in the employee's

EEOC charge," *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 712 (2d Cir.1998), because the purpose of the exhaustion requirement is "to give the administrative agency the opportunity to investigate, mediate, and take remedial action," *Stewart v. United States Immigration and Naturalization Serv.,* 762 F.2d 193, 198 (2d Cir. 1985), and to "encourage settlement of discrimination disputes through conciliation and voluntary compliance." *Butts,* 990 F.2d at 1401. The Second Circuit has recognized three kinds of situations where claims not alleged in an EEOC charge are "reasonably related" to the allegations in the charge such that it would be unfair to civil rights plaintiffs to bar their claims in a federal civil action.

■■ "Recognizing that EEOC charges are frequently filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering, the Second Circuit allows claims not raised in the charge to be brought in a civil action where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402 (internal quotation omitted).

■■ Here, plaintiff does not dispute that she was assisted by counsel in the preparation of her EEOC charge. Moreover, an EEOC investigation of a charge, such as plaintiff's, alleging and detailing incidents suggesting a hostile work environment cannot reasonably be expected to ferret out issues of disparate treatment or constructive discharge where the claimant fails to make such allegations. *See Findlay v. Reynolds Metals Co.,* 82 F.Supp.2d 27, 32–35 (N.D.N.Y.2000) (finding plaintiff's cause of action based upon disparate treatment barred due to his failure to exhaust administrative remedies and despite

allegations of a race-based hostile work environment and retaliation); *cf. Osier v. Broome County,* 47 F.Supp.2d 311, 319–22 (N.D.N.Y.1999) (dismissing plaintiff's cause of action based upon an alleged hostile work environment due to her failure make such a claim in her EEOC charge despite adequately alleging her disparate impact claim). Plaintiff's EEOC charge limits her claims to sexual harassment and a sexually hostile work environment. Absent from plaintiff's administrative complaint are allegations that defendants denied her the same job opportunities provided to similarly situated male employees by limiting her job assignments, wages, or other work-related benefits. The bases underlying plaintiff's disparate treatment claim-that defendants denied her certain job assignments, computer training and booking training opportunities and that defendants required her to guard a larger number of inmates than similarly situated male COs-are wholly absent from plaintiff's EEOC complaint. Dkt. No. 58, Ex. B. Moreover, the hostile work environment charges, as plaintiff articulated in her EEOC charge, are too far removed from allegations of constructive discharge or disparate treatment and cannot reasonably be expected to define the scope of the EEOC's investigation so as to include charges of constructive discharge or disparate treatment. The first "reasonably related" exception does not apply.

The Second Circuit also allows claims alleging retaliation by an employer against an employee for filing an EEOC charge. *Butts,* 990 F.2d at 1402. This second "reasonably related" exception need not detain the court long. The second exception applies to claims of retaliation that arise after an employee files his or her administrative charge. Here, plaintiff makes no claim of retaliation, and it is undisputed that plaintiff filed her EEOC charge seven months after she resigned her position at the correctional facility, thereby negating any opportunity for retaliation. Thus, the second "reasonably related" exception does not apply.

■ The Second Circuit also allows claims where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *Butts,* 990 F.2d at 1402–03. Because plaintiff's EEOC complaint documents specific incidents relating to her claim of a sexually hostile work environment, it cannot therefore be said that her claims of disparate treatment represent further incidents of discrimination carried out in the same manner as alleged in her EEOC complaint. Plaintiff's disparate treatment claim-based upon defendants' alleged failure to make certain post assignments and training available-relies on very different incidents of discrimination than those underlying her hostile work environment claims. *See Findlay,* 82 F.Supp.2d at 34–35. Thus, the third "reasonably related" exception does not apply to plaintiff's disparate treatment claims. Accordingly, plaintiff's cause of action based upon disparate treatment is barred due to plaintiff's failure to exhaust administrative remedies. The same cannot be said for plaintiff's constructive discharge claim because it is based upon, at least in part, allegations that plaintiff was subjected to "obscene, offensive and degrading behavior," which fairly describes the allegations contained in her EEOC complaint. Dkt. No. 60, Pl.'s Mem. of Law at 22,

### B. Constructive Discharge

■ While clearing the administrative exhaustion hurdle, on the merits, plaintiff's constructive discharge claim fails. Constructive discharge of an employee occurs "when an employer, rather than directly discharging an individual, intentionally cre-

ates an intolerable work environment that forces an employee to quit involuntarily." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir.2000). Claims of constructive discharge are evaluated by an objective standard. "A constructive discharge can generally not be established ... simply through evidence that an employee was dissatisfied with the nature of his assignments ... [n]or is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993). "To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied ... that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987); *Whidbee*, 223 F.3d at 73 ("Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (quoting *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 89 (2d Cir.1996) (internal quotation marks and citation omitted)). Constructive discharge also requires deliberate action on the employer's part, and while the meaning of "deliberate" is unsettled, "something beyond mere negligence or ineffectiveness is required." *Id.* at 74; *see e.g., Kader v. Paper Software, Inc.*, 111 F.3d 337, 341 (2d Cir.1997) ("[Plaintiff] has demonstrated that an uneasy and stressful environment existed, but he has adduced no evidence to support an inference that his employer intentionally created an intolerable workplace."). Additionally, to "demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more severe than that required to show a hostile work environment." *Ternullo v. Reno*, 8 F.Supp.2d 186, 192 (N.D.N.Y.1998); *see also Whidbee*, 223 F.3d at 73–74 (citing *Ternullo* ).

The court finds no evidence that defendants "intentionally create[d] an intolerable work atmosphere that force[d] [plaintiff] to quit involuntarily." *Chertkova*, 92 F.3d at 89. There are neither allegations nor evidence to suggest that defendants sought plaintiff's resignation, threatened to or actually reduced plaintiff's monetary compensation or benefits, *see Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161–62 (2d Cir.1998) (finding evidence that defendants reduced plaintiff's salary from $60,000 plus override to $26,000 without override could constitute a condition so difficult that a reasonable person would have felt compelled to resign), engaged in a pattern of baseless criticisms, *see Chertkova*, 92 F.3d at 89 (finding constructive discharge where "supervisor engaged in a pattern of baseless criticisms, said [plaintiff] would not 'be around,' and that [plaintiff] would be fired instantly if she did not meet certain ambiguous behavior objectives"); or threatened to terminate plaintiff's employment, *see id.; Lopez*, 831 F.2d at 1188 (finding evidence of constructive discharge because supervisor told employee "he would be fired at the end of [a] probationary period no matter what he did to improve his allegedly deficient performance"); *Terry v. Aschroft*, 336 F.3d 128, 152 (2d Cir.2003) (finding plaintiff made sufficient showing to allow reasonable fact-finder to conclude that a reasonable person in plaintiff's shoes would have felt compelled to resign where plaintiff's supervisors commented to him that his "days are numbered," that his "life's over with," and that he was "going to be brought up on more charges"). In fact, when Rooney and Doherty interviewed plaintiff, they encouraged her to continue her employment with the Sheriff's Department. *See* Dkt. No. 59, Pl.'s Statement of Material Facts at ¶ 60.

Plaintiff has not demonstrated conduct more severe than that required to show a hostile work environment. Plaintiff left active employment at the correctional facility due to an off-the-job automobile accident and voluntarily resigned her position more than two months later. In short, there is nothing to suggest that plaintiff was "compelled" to resign. *See Whidbee*, 223 F.3d at 74 (finding that while manager's comment that if a co-worker's behavior did not stop, then plaintiffs may have to leave "might be seen as evincing a lack of concern about the plaintiffs' situation," it did not support an inference that defendant intended to create intolerable working conditions). Accordingly, defendants' motion for summary judgment dismissing plaintiff's constructive discharge claim is granted.

## C. Disparate Treatment

Even if the court were to reach plaintiff's disparate treatment claims on the merits, the result would be no different. Plaintiff's disparate treatment claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At the first stage of the *McDonnell Douglas* analysis, a plaintiff must present facts sufficient to establish a *prima facie* case of disparate treatment by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) an adverse employment action occurred; and (4) the adverse employment action took place under circumstances giving rise to an

inference of discrimination. *Id.* "Although the burden of production then shifts to the defendant to articulate a non-discriminatory reason for the challenged employment decisions, once the defendant proffers a legitimate motive, the presumption of discrimination triggered by the *prima facie* case no longer operates." *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997) (citations omitted). "At that point, the plaintiff has the opportunity to demonstrate that defendant's articulated reason for its decision is in fact a pretext for discrimination." *Id.*

Defendants assume plaintiff meets the first two elements of the *prima facie* analysis and the record confirms the same: as a female, plaintiff is a member of a protected class, and defendants have never questioned plaintiff's qualifications as a corrections officer. Dkt. No.57, Defs.' Mem of Law at 12; Dkt. No. 60, Pl.'s Mem. of Law at 20. As to the third element, plaintiff baldly concludes that defendants subjected her to an adverse employment action: (1) every time they denied her the opportunity to work in the A–Pod when two or more female COs were assigned to a particular shift; (2) every time they denied her the opportunity to work in the booking area; (3) every time they denied her the opportunity to work outside detail; (4) every time defendants denied her computer training; and (5) every time defendants forced her to guard nearly double the number of inmates as compared with similarly situated male officers.[6] Dkt. No. 60, Pl.'s Mem. of Law at

---

**6.** Plaintiff makes separate allegations as to the Sheriff's Department's supervisory personnel (1) denying her the opportunity to work in "booking" and (2) denying her computer training. Defendants assert, however, that the only computer training offered to COs at the correctional facility is for the booking area and that in reality plaintiff's two separate allegations are but one. Dkt. No. 57, Defs.' Mem of Law at 11, n. 6. Plaintiff confirms as much in her affidavit. Dkt. No. 61, Dunbar Aff. at ¶ 46. Plaintiff also makes distinct allegations as to the Sheriff's Department's supervisory personnel (1) denying her the opportunity to work in the A–Pod and (2) forcing her to guard nearly double the num-

20–21. As stated above, plaintiff never asked any supervisory personnel at the Sheriff's Department to change the shift(s) she worked, nor did she request a reassignment, nor did she request computer training. Dkt. No. 56, Def.'s Statement of Material Facts at ¶¶ 11–13. Plaintiff never asked to be assigned to the booking area. *Id.* at 23. Plaintiff never asked a supervisor to be assigned to "outside detail," nor did she ask to be assigned to the "A–Pod" rather than the "B–Pod" areas of the correctional facility and was in fact assigned to each pod. *Id.* at 20–22. Plaintiffs admissions beg the question: how can defendants deny plaintiff opportunities she never sought or requested?-plaintiff's assertion is not that defendants offered certain opportunities to her co-workers without offering those same opportunities to her, but rather that defendants flatly denied her certain opportunities.

Assuming *arguendo* that they denied plaintiff particular post assignments that she sought, defendants argue that they did not subject her to any adverse employment action because the various post assignments in question carried with them no additional pay or benefits. While Title VII's protections extend beyond "instances of discrimination in pecuniary emoluments," *Rodriguez v. Board of Educ. of Eastchester Union Free Sch. Dist.,* 620 F.2d 362, 366 (2d Cir.1980), those other instances seem related to a change in job responsibility or a loss of job prestige. *See Id.* at 366 (holding transfer of art teacher from junior high school to elemen-

tary school to be an adverse employment action); *de la Cruz v. New York City Human Resources Admin. & Dep't of Soc. Servs.,* 82 F.3d 16, 21 (2d Cir.1996) (holding transfer from elite Adoption Unit to less prestigious Foster Care Unit arguably altered the terms and conditions of plaintiff's employment in a negative way); *Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir.1987) (collecting cases).

Here, plaintiff does not contest that the various post assignments carried no additional pay or benefit, and she has not articulated any loss of prestige associated with any of the Sheriff's Department's supervisory personnel's alleged post assignment denials-booking/computer; outside detail; and A-pod/B-pod. Plaintiff has alleged, however, that the A-pod/B-pod post assignments carried different levels of responsibility. Specifically, because three officers guarded a maximum of 120 inmates in the A-pod while one officer guarded a maximum of 90 inmates in the B-pod, the officer guarding the B-pod potentially faced guarding more than double the number of inmates as compared to the officers in B-pod. This disparity on its face is enough to satisfy the third element of the *McDonnell Douglas prima facie* analysis. As to the fourth element, plaintiff asserts that "women were … routinely required to guard more inmates than similarly situated males." Dkt. No. 60, Pl.'s Mem. of Law at 21. With nothing more, this would be sufficient to give rise to an inference of discrimination. Defendants, however, have articulated a non-discrimi-

---

ber of inmates as compared with similarly situated male officers. As gleaned from plaintiff's affidavit, these too are but a single claim. Plaintiff claims that the Sheriff's Department's supervisory personnel routinely assigned four officers-one in the tower and three on the floor-to guard the A-pod, which housed a maximum of 120 inmates, while they routinely assigned two officers-one in the

tower and one on the floor to guard the B-pod, which housed a maximum of 90 inmates. Clearly plaintiff's allegation that the Sheriff's Department's supervisory personnel forced her to guard nearly double the number of inmates is directly related to her allegation that they denied her the opportunity to work in A-pod.

natory reason for the disparity as to the number of inmates Department supervisory personnel required female COs to guard versus male COs.

At the County's correctional facility, the A-pod housed male inmates and male inmates alone. Moreover, the A-pod housed the most difficult segments of the inmate population: violent offenders and juveniles. In contrast, three housing units-two male housing units and one female housing unit-and a "dorm" area housing "Trustees"[7] comprised the B-pod. Dkt. No. 58, Bowen Aff. at ¶ 8. Because the B-pod housed female inmates, special consideration had to be given to its staffing. Pursuant to New York State County Law § 652(2), "[a] female correction officer ... shall be in attendance in a correctional facility when females are confined in the correctional facility and shall, when deemed necessary by the sheriff ... to maintain the order and security of the facility, be in attendance in any housing unit where females are confined." Bowen found it necessary and appropriate to require one female CO to be on the B-pod floor at all times. Dkt. No. 58, Bowen Aff. at ¶ 14. Bowen's B-pod staffing policy complied with County Law § 652(2) and protected the privacy rights of female inmates, who were subjected to pat downs, bed checks, cell searches and strip searches. See Dkt. No. 57, Defs.' Mem. of Law at 13. The court finds that plaintiff's argument that the Department's supervisory personnel forced her and other female COs to guard "nearly double" the number of inmates versus male guards does not paint an accurate picture of the responsibilities associated with guarding the B-pod versus the A-pod. Sheer numbers aside, the pods apparently differ widely in their inmates' level of volatility.

Perhaps, as Bowen suggests, "there is no difference in the difficulty" of working the B-pod versus A-pod. *Id.* at ¶ 11. Regardless, defendants have proffered a legitimate motive for the way in which they staffed the B-pod versus the A-pod. Thus, the presumption of discrimination triggered by the *prima facie* case no longer operates. Plaintiff has made no effort to demonstrate that defendant's articulated reason for its A-pod/B-pod staffing decisions is in fact merely a pretext for discrimination. Plaintiff failed to demonstrate that the alleged denials resulted in any negative consequences or tangible harm to her. She also left uncontested defendants' legitimate non-discriminatory motive for its staffing decisions. Accordingly, defendants' motion for summary judgment dismissing plaintiff's disparate treatment claims is granted.

## V. Plaintiff's § 1983 Claim

### A. *Municipal Defendants*

To establish municipal liability under 42 U.S.C. § 1983 for unconstitutional acts perpetrated by its employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy, custom or practice. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Plaintiff may satisfy the "policy, custom or practice" requirement by demonstrating either: (1) a formal policy officially endorsed by the municipality, *see Id.* at 690, 98 S.Ct. 2018; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986); (3) a practice so con-

---

7. "Trustees" are the least violent inmates who have privileges and work opportunities that the rest of the inmates typically do not enjoy. Dkt. No. 58, Bowen Aff. at ¶ 8.

sistent and widespread that it constitutes a "custom or usage" sufficient to impute constructive knowledge of the practice to policymaking officials, *see Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to "deliberate indifference" to the rights of those who come in contact with the municipal employees, *see City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Additionally, a plaintiff must show a causal link between an official policy or custom and his injury in order for the court to find liability against the municipality. *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) (citing *Monell,* 436 U.S. at 694 n. 58, 98 S.Ct. 2018).

■■■ Here, plaintiff's allegations that defendants violated 42 U.S.C. § 1983 are based exclusively on allegations that Bowen maintained a policy of failing to respond to complaints of sexual harassment and that this policy became the County's and the Sheriff's Department's custom or usage. *See* Dkt. No. 29, Am. Compl. at ¶ 41, 45 and 49. Plaintiff can point to only a single complaint filed in accordance with the County's Policy during her employment with the Sheriff's Department, and that complaint was investigated. As the court previously found, as a result of its investigation into that complaint, the Sheriff's Department arguably should have known about an additional "complaint," namely plaintiff's allegations of sexual harassment despite her failure to formally file a complaint in accordance with the Policy. Based upon this single contested issue, however, the court is unwilling to characterize Rooney's and Doherty's inaction in this matter as a consistent and widespread practice reflecting a custom or usage of the County's or the Sheriff's Department's policymaking officials. The

court grants defendants' motion for summary judgment dismissing plaintiff's claims based upon 42 U.S.C. § 1983 as to the County and the Sheriff's Department.

### B. Bowen

■■■ It is well-established that a defendant will be liable under 42 U.S.C. § 1983 only when he is personally involved in the violation. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Personal involvement of a supervisory defendant may be shown by evidence that the defendant (1) directly participated in the violation; (2) failed to remedy the wrong after being informed through report or appeal of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates in who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of a plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

Plaintiff contends that Bowen: (1) had constructive knowledge of plaintiff's coworkers' degrading behavior and took no remedial action; (2) permitted a custom or policy under which plaintiff's constitutional rights were violated; and (3) was grossly negligent in managing his subordinates who caused the unlawful conduct. Dkt. No. 60, Pl.'s Mem of Law at 25. Defendants contend, however, that Bowen is entitled to qualified immunity and the court agrees.

■■■ Qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 268 (2d Cir. 1996). As a threshold matter while evaluating a motion for summary judgment on the basis of qualified immunity, the court must inquire whether, construing the facts in the light most favorable to plaintiff, "the facts alleged show the [public official's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the court must determine whether the right in question was clearly established at the time of the violation; that is, whether "it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Id.; see Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) ("Even when a plaintiff's federal rights are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."). Therefore, a qualified immunity defense is established when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002).

▮ The court finds that it was objectively reasonable for Bowen to believe that his conduct did not violate the law. He never sexually harassed plaintiff, never observed plaintiff's alleged sexual harassment, never took any adverse employment action against her, and was never personally aware of plaintiff's allegations of sexual harassment.[8] Bowen also had a reason-

able policy for his subordinates to pursue in the event they opted to complain of harassment; Bowen investigated those matters brought to his attention. The court finds that Bowen is entitled to qualified immunity and grants defendants' motion for summary judgment dismissing plaintiff's claims pursuant to 42 U.S.C. § 1983 against Bowen.

### CONCLUSION

**WHEREFORE,** after careful consideration of the file in this matter including the parties' submissions and oral argument, and the applicable law, the court hereby

**GRANTS** defendants' motion for summary judgment dismissing plaintiff's Constructive Discharge claim, Disparate Treatment claims, and claims pursuant to 42 U.S.C. § 1983 as to all defendants; and the court hereby

**DENIES** defendants' motion for summary judgment dismissing plaintiff's Hostile Work Environment and New York State Human Rights claims.

**IT IS SO ORDERED.**

---

8. As the court noted above, Rooney and Doherty had constructive or actual knowledge of the alleged harassment. The court finds nothing in the record to suggest that they conveyed such knowledge to Bowen. *See* Dkt. No. 61, Ex. M, Doherty Dep. at 75–84.